**Slip Op. 02-4**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, SENIOR JUDGE**

| | |
|---|---|
| ASOCIACION DE PRODUCTORES DE SALMON Y TRUCHA DE CHILE AG,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES INTERNATIONAL TRADE COMMISSION,<br><br>Defendant,<br><br>COALITION FOR FAIR ATLANTIC SALMON TRADE,<br><br>Defendant-Intervenor. | **PUBLIC VERSION**<br><br>Court No. 98-09-02759 |

[ITC positive injury determination sustained.]

Dated: January 9, 2002

Arnold & Porter (Michael T. Shor and Kevin T. Traskos), for plaintiff Asociación de Productores de Salmón y Trucha de Chile AG.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Tina Potuto, Attorney, Office of the General Counsel, U.S. International Trade Commission, for defendant.

Collier, Shannon, Rill & Scott, PLLC (Michael J. Coursey, Kathleen W. Cannon, and John M. Herrmann), for defendant-intervenor Coalition for Fair Atlantic Salmon Trade.

#### OPINION

**GOLDBERG, Senior Judge:** In this action, the Court reviews a challenge to the final determination of the United States International Trade Commission (the "Commission" or the "ITC") in

Fresh Atlantic Salmon from Chile, USITC Pub. 3116, Inv. No. 731-TA-768 (July 1998)("Final Determination"), as modified by the Commission's three views on remand.  See Notice: Fresh Atlantic Salmon from Chile, 63 Fed. Reg. 40,315 (July 28, 1998) (notice of Final Determination); Fresh Atlantic Salmon From Chile, Commission Determination on Remand, USITC Pub. 3244, Inv. No. 731-TA-768 (Remand) (October 1999) ("Views on First Remand"); Fresh Atlantic Salmon From Chile, USITC Pub. 3347, Inv. No. 731-TA-768 (Second Remand) (August 2000) ("Views on Second Remand"); Fresh Atlantic Salmon From Chile, USITC Pub. 3357, Inv. No. 731-TA-768 (Third Remand) (September 2000) ("Views on Third Remand"). Plaintiff Asociación de Productores de Salmón y Trucha de Chile AG ("Asociación") argues that the positive injury determinations of both Commissioner Lynn M. Bragg ("Commissioner Bragg") and Commissioner Marcia E. Miller ("Commissioner Miller") were neither in accordance with law nor supported by substantial evidence.

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1994).  The Court sustains the ITC's Final Determination as modified by the three views on remand.

## BACKGROUND

In June 1997, after the Coalition for Fair Atlantic Salmon Trade ("FAST") filed a petition seeking antidumping and

countervailing duties on fresh Atlantic salmon from Chile, the Commission instituted antidumping and countervailing duty investigations of fresh Atlantic salmon from Chile.  See Fresh Atlantic Salmon from Chile, 62 Fed. Reg. 33,678 (June 20, 1997). In August 1997, the Commission rendered an affirmative preliminary injury determination.  See Fresh Atlantic Salmon from Chile, 62 Fed. Reg. 42,262 (Aug. 6, 1998).  In January 1998, the U.S. Department of Commerce ("Commerce") rendered a preliminary affirmative determination of sales at less than fair value.  See Fresh Atlantic Salmon from Chile: Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponenment of Final Determination, 63 Fed. Reg. 2664 (Jan. 16, 1998).

In July 1998, Commissioner Bragg concluded that the U.S. fresh Atlantic salmon industry was threatened with imminent material injury by reason of subject Chilean imports.  See Final Determination at 3.  Commissioner Miller concluded that the U.S. industry was currently materially injured by reason of such imports.  See id.  Commissioner Crawford determined that the domestic industry was neither materially injured nor threatened by reason of the subject imports.  See id.  As a result of a 2-1 vote, the Commission made an affirmative injury determination. See id.

On August 27, 1998, the Asociación appealed the Commission's affirmative injury determination to this Court.  The Asociación

argued that the determination was not supported by substantial evidence and was contrary to law in its (a) utilization of record evidence, (b) the Commission's discussion of injury causation and, (c) the effects of dumping margins.  Subsequently, the Commission filed a motion with the Court seeking a voluntary remand to determine whether its calculation of foreign production and capacity data was in error, and to allow the Commission to reconsider, if necessary, its affirmative threat determination. On July 2, 1999, the Court granted the Commission's motion and directed the Commission to reopen the record to "verify the accuracy of its foreign production, shipments and capacity data" and to "take any action necessary after reexamining the foreign production, shipments and capacity data."  Asociación de Salmón y Trucha de Chile AG v. United States International Trade Commission et al., Slip Op. 99-58, 1999 WL 486540 (July 2, 1999).

In October 1999, after reconsidering the data, and accepting new data from interested parties, the Commission again determined that there was a threat of material injury to the American fresh Atlantic salmon industry.  See Views on First Remand.  The Court, however, was not satisfied that the Commission accurately verified the foreign production, shipments, and capacity data.

Therefore, the Court issued Asociación de Productores de Salmón y Trucha de Chile AG v. United States International Trade Commission et al., Slip Op. 00-87, 2000 WL 1051973 (July 27,

2000) ("Second Remand Order") directing the Commission to "either (1) adjust the 1998 production data for the consolidated subject producers or (2) to justify the determination that the 1998 production data is, as is, the best information available to it."

In response to the Second Remand Order, in August of 2000, the Commission filed the Views on Second Remand. There the Commission found, among other things, "that information necessary to [its] determination is not available on the record, and the unadjusted [1998 production] data are the facts otherwise available for [the Commission] to reach [its] determination. 19 U.S.C. § 1677e(a)." See Views on Second Remand at 9 n.27.

Again, the Court found the Commission's response to be lacking. Specifically, the Commission failed to explain how it had complied with the statutory requirements for adopting facts otherwise available. See 19 U.S.C. §§ 1677e, 1677m (1994). The Court remanded to the Commission once again in Asociación de Productores de Salmón y Trucha de Chile AG v. United States International Trade Commission et al., Slip Op. 00-117, 2000 WL 1279826 (September 8, 2000). The Commission then issued its Views on Third Remand, explaining that it did utilize facts otherwise available and why it choose to do so.

## STANDARD OF REVIEW

The Commission's Final Determination will be sustained if it is supported by substantial evidence on the record and is

otherwise in accordance with law.  See 19 U.S.C. § 1516a(b)(1)(B) (1994).

To determine whether the Commission's interpretation of a statute is in accordance with law, the Court applies the two-prong test set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Chevron first directs the Court to determine "whether Congress has directly spoken to the precise question at issue."  Id. at 842.  To do so, the Court must look to the statute's text to ascertain "Congress's purpose and intent."  Timex V.I., Inc. v. United States, 16 Fed. Cir. (T) __, __ , 157 F.3d 879, 881 (1998) (citing Chevron, 467 U.S. at 842-43 & n.9).  If the plain language of the statute is not dispositive, the Court must then consider the statute's structure, canons of statutory interpretation, and legislative history.  See id. at __, 157 F.3d at 882 (citing Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 470-80 (1997)); Chevron, 467 U.S. at 859-63.  If, after this analysis, Congress's intent is unambiguous, the Court must give it effect.  See Timex V.I., Inc., 16 Fed. Cir. (T) at __, 157 F.3d at 882.

If the statute is either silent or ambiguous on the question at issue, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843 (footnote omitted).  Thus,

the second prong of the <u>Chevron</u> test directs the Court to consider the reasonableness of the Commission's interpretation. <u>See</u> <u>id.</u> The level of deference afforded an agency interpretation is directly related to the extent to which Congress explicitly delegated authority to the agency to make such an interpretation, as well as the manner in which the interpretation was promulgated. <u>See</u> <u>U.S. v. Mead Corp.</u>, 533 U.S. 218, __, 121 S.Ct. 2164, 2171 (2001).

With respect to the Commission's factual findings, the Court will sustain the Commission's determinations if they are supported by substantial evidence. "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." <u>Ceramica Regiomontana, S.A. v. United States</u>, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986) (citations omitted), <u>aff'd</u>, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). In applying this standard, the Court must sustain the Commission's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions. <u>See</u> <u>Atlantic Sugar, Ltd. v. United States</u>, 2 Fed. Cir. (T) 130, 137, 744 F.2d 1556, 1563 (1984).

**DISCUSSION**

**I.   The Commission's Threat of Material Injury Determination is in Accordance with Law and Supported by Substantial Evidence.**

Under U.S. law, an affirmative threat determination requires the Commission to find that "further dumped or subsidized imports are imminent and [that] material injury by reason of imports would occur unless an order is issued or a suspension agreement is accepted . . . ."  19 U.S.C. § 1677(7)(F)(ii) (1994). Affirmative threat determinations must be based on "positive evidence tending to show an intention to increase levels of importation."  BIC Corp. v. United States, 21 CIT 448, 464, 964 F. Supp. 391, 405 (1997) (quoting Metallverken Nederland B.V. v. United States, 14 CIT 481, 488, 744 F. Supp. 281, 287 (1990)).

### A. The Commission's Use of the Consolidated Data in Making Its Determination is in Accordance With Law and the Data is Substantial Evidence Supporting Its Threat of Material Injury Determination.

The Commission determined that there was a threat of material injury because "the subject producers have existing unused and imminent substantial increases in capacity that indicate the likelihood of substantially increased imports of the subject merchandise into the United States."  Views on First Remand at 20.  The Commission reasoned that the "subject producers will use expanded capacity and/or any increased capacity utilization to substantially increase their exports to the United States."  Final Determination at 24.  The Commission also found that the U.S. market was particularly vulnerable because the "demand for salmon in the United States is expected to continue growing in the future."  Views on First Remand at 21.

Prior to the remands, the Asociación argued that in making

its determination the Commission relied on improperly compiled

subject producer data[1], including "double-counted"[2] data.  See

---

[1]Compiled subject producer data consists of "consolidated
subject producer data" and subject producer data submitted by
larger individual salmon producers.  The "consolidated subject
producer data" is data that was submitted by the Asociación at
the request of the Commission.  The data represents the
production and capacity information for a number of smaller
Chilean salmon producers, including production and capacity data
for Fiordo Blanco.  The data that was submitted individually by
the larger Chilean salmon producers included data from Fiordo
Blanco.

[2]"Double-counting" is a term utilized by the parties in this
proceeding to explain that one of the Chilean producers, Fiordo
Blanco, may have been accounted for twice in the data
compilation.  It does not mean that Fiordo Blanco's data is
exactly doubled, only that data may have been included twice.
Fiordo Blanco separately submitted actual production and
capacity data for 1998 to the Commission.  See Views on Second
Remand at 10.  In its submission, the Asociación also included in
its 1998 consolidated subject producer data estimated Fiordo
Blanco production and capacity levels.  See id.  Therefore,
Fiordo Blanco was included twice, as both an individual producer
and as part of the consolidated producers represented by the
Asociación's data.  Since the Asociación did not provide the
Commission with a breakdown of its 1998 data so that the
Commission could remove the estimated Fiordo Blanco data from the
consolidated subject producer data, the ITC considered whether to
follow the Asociación's proposed solution to exclude the actual
Fiordo Blanco production and capacity levels from the 1998
subject producer data.  See Views on Third Remand at 5; Views on
Second Remand at 10; Pl.'s Mem. in Opp'n to Third Remand
Determination and in Supp. of Rule 56.2 Mot. for J. on the Agency
R. at 2.
Fiordo Blanco were much higher than what the Asociación had estimated as
likely that the actual production and capacity levels for Fiordo
Blanco were much higher than what the Asociación had estimated as
Fiordo Blanco's 1998 production and capacity levels.  See Views
on Second Remand at 10.  If the actual levels were not included
in the subject producer data, the resulting figures would
underestimate the subject producers' production and capacity
levels for 1998.  See id.

Initial Br. of Asociación de Productores de Salmón y Trucha de

Chile AG in Supp. of Rule 56.2 Mot. for J. on the Agency R.

("Pl.'s Initial Br.") at 16-19.  After the three remands, the

Asociación still maintains that the Commission improperly relied

on double-counted data, not only because it is an insufficient

basis for a threat determination, but also on the grounds that

the Commission acted contrary to the statute in considering the

double-counted data.  See Pl.'s Mem. in Opp'n to Third Remand

Determination and in Supp. of Rule 56.2 Mot. for J. on the Agency

R. ("Pl.'s Third Remand Memo").

**1.    The Commission's Treatment of the Consolidated
        Subject Producer Data is in Accordance with Law.**

The Commission concedes that the consolidated subject

producer data contains some inaccurate data.  See Views on Third

Remand at 5.  In its Views On Third Remand, however, the ITC

states that its use of the imperfect data is permissible under 19

U.S.C. §§ 1677e(a) and 1677m(d).[3]  The Commission reasons that

---

[3]Section 1677e(a) provides:

(a) In general
    If-
        (1) necessary information is not available on the
        record, or
        (2) an interested party or any other person -
            (A) withholds information . . .,
            (B) fails to provide such information . . .,
            (C) significantly impedes a proceeding under
        this subtitle, or
            (D) provides such information but the
        information cannot be verified as provided in
        section 1677m(i) of this title,

the data cannot be recalculated to remove the double-counted information because the Asociación was unable to provide the Commission with deconsolidated production data for Fiordo Blanco -- the producer that was double-counted. See Views on Third Remand at 5-6. The Commission claims that it acted in accordance with 19 U.S.C. § 1677e(a) in using "facts otherwise available," specifically the imperfect consolidated producer data. See id. at 6. The ITC further states that the notice requirements of § 1677m(d) are not implicated in this case because the Asociación never failed to comply with a request for information. See id. at 6-7.

---

> The administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

19 U.S.C. 1677e(a).

Section 1677m(d) states:

> (d) Deficient submissions
> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. 1677m(d).

The Asociación argues that the Commission's treatment of the production data is not in accordance with law. First, the Asociación claims that the ITC's determination is inconsistent with the statute authorizing use of facts otherwise available, 19 U.S.C. 1677e(a). See Pl.'s Third Remand Memo at 2. The Asociación argues that the statute does not authorize the Commission to utilize data known to be incorrect; rather it compels the Commission to use facts otherwise available to correct imperfect data where the preferred data is not available. See id. The Asociación claims that there is data on the record that the Commission can utilize to avoid double-counting, and that the statute compels the Commission to do just that.[4] See id. at 2-3.

Second, the Asociación argues that the Commission has made an impermissible adverse inference[5] against the subject producers by valuing Fiordo Blanco's contribution to the Asociación's

---

[4]The Asociación claims that the Commission can avoid double-counting by excluding the actual Fiordo Blanco production and capacity levels for 1998 from the subject producer data. Pl.'s Third Remand Memo at 2; see also supra n.1.

[5]If the Commission finds that the respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . [the Commission] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).

consolidated subject producer data at zero.[6]  See id. at 3.  The

Asociación alleges that the adverse inference was impermissible

because the Commission never found a deficiency in any Chilean

data response.  See id. (citing 19 U.S.C. § 1677e(b)).

The Court finds that the Commission properly relied upon

facts otherwise available in considering the imperfect 1998

consolidated subject producer data.  See 19 U.S.C. §

1677e(a)(2)(D).  After determining that the information on the

record was imperfect, the Commission used the imperfect 1998

consolidated subject producer data to arrive at what, in its

view, best approximated the likely capacity of subject producers

in 1998.  The Commission went to some lengths to explain why it

chose to utilize the unadjusted 1998 consolidated subject

---

[6]The Asociación argues that the Commission effectively
valued Fiordo Blanco's estimated 1998 production and capacity
levels, which were included in the consolidated subject producer
data, at zero.  Pl.'s Third Remand Memo at 2.  That is, the ITC
subtracted nothing from the 1998 consolidated subject producer
data, and made no adjustment to the consolidated subject producer
data to remedy the double-counting.  The Commission did so
because it found no adjustment to be a better estimate of the
likely production and capacity levels of subject producers in
1998.  See Views on Third Remand at 6; Views on Second Remand at
17.  In Views on Second Remand, the Commission tried two
different adjustments to the capacity and production data to
remove Fiordo Blanco data from the Asociación's consolidated
subject producers data.  Views on Second Remand at 11-18.  Both
adjustments affirmed the ITC's initial conclusion that the U.S.
industry is threatened with material injury by reason of subject
imports from Chile.  Id. at 17.  However, because of problems
with the Asociación's data, the Commission decided to rely on the
unadjusted 1998 subject producers' production and capacity data.
Id.

producer data as facts otherwise available. See Views on Second Remand at 9. The ITC reasoned that the Asociación had underestimated production levels, admitted making unidentified "clerical errors," and was unable to parse its original consolidated subject producer data to account for the included Fiordo Blanco data. See id. at 8 n.25. Thus, the Commission decided that to make any more adjustments would only "further exacerbate[] overall data problems." Id. at 9.

The Commission also explained why she chose not to employ the methodology favored by the Asociación, namely to exclude the separately submitted Fiordo Blanco production and capacity levels from the total subject producers data. See id. at 10. The Commission surmised that the Asociación likely calculated its 1998 Fiordo Blanco data from the production and capacity data it assigned to Fiordo Blanco in 1997. Because Fiordo Blanco reported significant increases in 1998, the Commission reasoned that the Asociación's calculation of consolidated subject producer data included underestimated 1998 Fiordo Blanco data. Thus, subtracting the reported Fiordo Blanco production and capacity level data from the 1998 consolidated subject producer data would likely inaccurately diminish the consolidated subject producer data, rendering the numbers even more inaccurate. See Views on Second Remand at 10.

The Commission's chosen data set was reasonable because, faced with a choice between imperfect alternatives, the ITC opted for the one that it considered less inaccurate. See Fabrique de Fer de Charleroi S.A. v. United States, 25 CIT __, __, 155 F. Supp. 2d 801, 809 (2001) ("Making a determination based on facts available, [the Commission] should: (1) strive to arrive to 'the most reasonable estimate,'. . . and (2) rely on the data that has a 'rational relationship . . . [to] the matter.'") (quoting National Steel Corp. v. United States, 18 CIT 1126, 1132, 870 F. Supp. 1130, 1136 (1994)); see also Acciai Speciali Terni S.P.A. v. United States, 25 CIT __, __, 142 F. Supp. 2d 969, 989-94 (2001) (Commerce could not use certain data as adverse facts otherwise available because it was "inherently distortive and unreasonable," but Commerce could use other data to draw adverse facts otherwise available because it was "a reasonable choice of facts, which certainly falls within the Department's discretion"). As discussed above, the Commission's decision to use the unadjusted 1998 consolidated subject producer data as facts otherwise available was reasonable under section 1677e(a). Further, the Asociación has not persuaded the Court that its proposed adjustment is any less inaccurate, or more reasonable, than the Commission's position.

Moreover, contrary to the Asociación's argument, the Commission did not value the Asociación's Fiordo Blanco data at

zero.  The ITC assumed that the Asociación included Fiordo Blanco

data in the consolidated data, but the Commission had no way of

knowing what that value was in order to subtract the double-

counted Fiordo Blanco data.[7]  What the Commission did find,

however, was that the aggregate consolidated data was likely

underestimated.  See Views on Second Remand at 9 n.26.[8]  In

choosing among the two adjusted data sets, discussed infra note

6, and the unadjusted subject producer data, the ITC chose to use

---

[7]In fact, the Commission gave the Asociación ample
opportunity to provide a breakdown of the 1998 aggregate data in
the first remand proceeding.  The Asociación was able to supply a
breakdown for the 1994-1997 data, but was unable to do so for the
1998 data.  See App. to Reply Br. of Asociación de Productores de
Salmón y Trucha de Chile AG in Supp. of Rule 56.2 Mot. for J. on
the Agency R. 53, Supplemental Questions Relating to Foreign
Producer: Questionnaire Response of Asociación de Productores de
Salmón y Trucha de Chile AG at Q1.  This is why the Commission
adjusted the 1994-1997 data to account for the double-counting,
but declined to do so for the 1998 data.  See Views on Second
Remand at 9.

[8]The Commission explained, as follows, why it found that the
aggregate consolidated data was likely underestimated:

> [The Commission] believe[s] that the Asociación's
> estimates of production generally under report the amount
> of production for each producer.  Their estimates for
> Fiordo Blanco, for example, were far off the mark and
> substantially under the amount reported by Fiordo Blanco
> for its future production . . . .  Moreover, the
> Asociación's methodology requires production to be equal
> to exports.  In fact, they have admitted that production
> does not equal exports because some production does go to
> home market shipments . . . .  Consequently, the
> Asociación's production numbers understate the actual
> production of the Chilean producers.

Views on Second Remand at 9 n.26.

the data it considered to be more accurate -- unadjusted subject producer data.  Thus, the Asociación's claim that the Commission made an impermissible adverse inference is without merit.

### 2. The Consolidated Data is Part of the Substantial Evidence Supporting The Commission's Positive Material Injury Determination.

The Asociación argues that the Commission's decision to utilize facts otherwise available prevents the capacity and production data from constituting substantial evidence because it values Fiordo Blanco's data at zero.  See Pl.'s Third Remand Memo at 3.  The Asociación also argues that even if using the double-counted 1998 data were valid, the slight increase in production and capacity between 1997 and 1998 would not support the Commission's positive injury determination.  See id. at 5.  Thus, the Asociación claims, the consolidated subject producer data cannot be used as substantial evidence to support the positive injury determination.  See id.

The Court finds that the consolidated data is part of the substantial evidence supporting the Commission's positive injury determination.  First, as explained supra, the ITC did not consider Fiordo Blanco's consolidated data to be zero.  Second, the increase in production between 1997 and 1998, however slight, is substantial evidence supporting the Commission's determination, because it is only part of the total "trend"

evidence upon which the Commission based its determination. See infra § I.B.1.

B. **The Commission's Finding that the Subject Producers Would Substantially Increase Exports to the United States in the Imminent Future by Increasing Their Capacity and Capacity Utilization is in Accordance with Law and Supported by Substantial Evidence.**

In the Final Determination the ITC found that subject Chilean producers of fresh Atlantic salmon "will use expanded capacity . . . to substantially increase their exports to the United States." Final Determination at 24. The Asociación argues that the Commission's determination that the subject producers will expand capacity, and capacity utilization, to substantially increase their exports to the United States is not supported by substantial evidence. See Pl.'s Initial Br. at 20. The Court does not agree.

1. **The Commission's Conclusion that the Subject Producers Would Increase Capacity is in Accordance with Law and Supported by Substantial Evidence.**

The Asociación argues that the Commission improperly disregarded Asociación data in determining that subject producers would increase capacity. See Reply Br. of Asociación de Productores de Salmón y Trucha de Chile AG in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Pl.'s Reply Br.") at 8. The Asociación claims that the foreign producers' questionnaire, the only record evidence regarding Chilean producers' capacity as a whole, was incorrectly interpreted to show an increase in future

capacity.  See Pl.'s Initial Br. at 20-21.  The Asociación also claims that the Commission misinterpreted the data because capacity is absolutely constrained by the amount of fish produced plus mortality.[9]  See id. at 22-23.  Finally, the Asociación claims that any plans to increase capacity could not be realized in the "imminent future" because of the constraints of the three-year production cycle for Atlantic salmon.  See id. at 21.[10]

As a threshold matter, the Asociación's argument that the Commission ignored or disregarded its data is without merit. The Commission explicitly stated that it accepted the Asociación's production and capacity level data concerning the consolidated subject producers.  See Views on First Remand at 14. The Commission duly considered the Asociación's consolidated data purporting to show that consolidated producers would decrease capacity in the future, but found the evidence of the producers that reported independently to be more persuasive.  The law is

---

[9]"Mortality" simply means the number of fish that died after they were placed in ocean pens.  The Commission expressly accepted the Asociación's data, stating that it "used the data reported by the Asociación to assess the production and capacity levels of the consolidated subject producers in this remand investigation."  Views on First Remand at 14.

[10]The production cycle for freshwater salmon is from 33 to 45 months.  See Pl.'s Initial Br. at 6 (citing App. to Pl.'s Initial Brief 3, Commission Final Staff Report, July 1998, Public Version at I-3 to I-4).  The Commission agreed: "It takes three years for farmed salmon to reach the optimum size for sale in the market . . . .  Given the length of the production cycle, the ability of salmon producers to increase production levels rapidly to satisfy demand is clearly constrained."  Final Determination at 17.

clear that the Commission does not have to explicitly address all information presented to it, only that it consider it. See 19 U.S.C. § 1677m(e). Ranchers-Cattlemen Action Legal Foundation v. United States, 23 CIT __, __, 74 F. Supp. 2d 1353, 1379 (1999) ("the fact that the ITC chose not to focus on certain data in its main report does not indicate that the ITC failed to consider that information as 'there is no statutory requirement that the Commission respond to each piece of evidence presented by the parties'") (quoting Granges Metallverken AB v. United States, 13 CIT 471, 477, 716 F. Supp. 17, 24 (1989)). The independently reported data indicated that [          ] producers would increase their capacity levels, and from this information the Commission reasonably concluded that subject producers as a whole would increase their capacity. See Views on First Remand at 22-23. As a result, this Court finds that the Commission did not disregard the Asociación's data, but merely found other evidence on the record to be more persuasive. See Goss Graphics Systems, Inc. v. United States, 22 CIT 983, 1004, 33 F.Supp. 2d 1082, 1100 (1998) ("The Commission has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis."), aff'd, 18 Fed. Cir. (T) __, 216 F.3d 1357 (2000).

Further, the Commission concluded that imports were likely to increase in the imminent future primarily by examining the

"trend" evidenced by the yearly data of the subject producers.

See Views on First Remand at 21.  The ITC found that the subject

producers as a whole increased their production and capacity

levels each year and thus a threat of increased capacity

utilization was substantial in the imminent future.  See id.  The

Court of International Trade has previously approved such a

"trend" analysis as reasonable.  See Bando Chem. Indus., Ltd. v.

United States, 17 CIT 798, 807 (1993), aff'd, 26 F.3d 139

(1994)(finding that Commission reasonably inferred from overall

trend of data that increased production likely destined for U.S.

market); Iwatsu Elec. Co., Ltd. v. United States, 15 CIT 44, 55,

758 F. Supp. 1506, 1515-16 (1991) (upholding use of imperfect

data as trend indicator).

The Commission's trend analysis was based on a reasonable

one-year capacity calculation.[11]  The Commission recognized that

capacity was constrained by the amount of harvestable fish in the

water in any given year.[12]  The Commission, however, realized

---

[11] Although the Commission certainly could have conducted a
capacity analysis differently, as discussed infra, the yearly
trend analysis is a permissible method of finding a imminent
threat of increased capacity utilization.

[12] Capacity is based on the calculation of the number of fish
produced in addition to the number of fish that died during a
year.  See Views on First Remand at 18.  As the Commission
explained,

> a producer's capacity level in a particular year is
> constrained by the number of harvestable fish that were
> in the water at the beginning of any particular year and

that this constraint was not absolute.[13]  Most importantly, due
to the ITC's yearly trend analysis, the Commission did not need
to rely on evidence of the three year Atlantic salmon production
cycle.

Moreover, the Court finds that the one-year capacity
evidence is substantial evidence supporting the Commission's
conclusion. The original and the revised data demonstrate
[                                                        ].  See Apps. to Pl.'s
Initial Br. ("Pl.'s Initial App.") 6, 9, 10, 12, 16,
Questionnaire Responses of Foreign Producers at 4; Views on First
Remand at 20; App. to Pl.'s Reply Brief 56, Comm'n Staff Report

---

that, therefore, a producer's capacity for that
particular year is arguably equal to its production for
the year plus the number of harvestable fish that died
during the year as the Asociación asserts.

Id. at 17-18.

[13]For example, mature salmon can be "held over" from year to
year if market conditions are not attractive for harvest.  See
App. to Pl.'s Initial Br. 2, ITC Staff Report at I-5.  Holding
over can affect capacity beyond the Asociación's simplified
production plus mortality calculation by keeping additional
capacity (the held-over salmon) from production.  See id.
Capacity can also be affected by the addition of developing
salmon at different stages of the three-year cycle.  See id. at
I-4 (producers sometimes purchase "smolt" or 18 month old
salmon).  Lastly, the record demonstrates that there may not be a
direct correlation between number of fish and capacity because
production is not measured in number of fish, but rather in
pounds.  See id. at II-2, VI-2.  Thus, climate changes or feeding
practices may affect production.  See id.

in Remand Proceeding at Tables A-1 to A-4.[14]  And the record
evidence demonstrated that [

]. See Pl.'s
Initial Apps. 9, 10, 16, Responses to Commission's Foreign
Producers' Questionnaire.  This evidence supports the ITC's
determination that subject producers will increase capacity in
the future.

The Court also finds meritless the Asociación's argument
that "imminent," as a matter of law, cannot mean within one to
two years.  See Pl.'s Reply Br. at 33-34.  The Commission
concluded that subject producers could increase shipments to the
United States "within one to two years."  See Views on First
Remand at 18 n.74.  The Asociación argues that, due to the three-
year production cycle, no capacity change could be realized
within three years.  See Pl.'s Initial Br. at 24.  Further, the
Asociación argues that, as a matter of law, "imminent" cannot
mean "within one or two years" and thus the Commission has
violated the statute by finding that increased capacity
utilization could lead to imminent increases in subject imports.

---

[14]Secondary evidence on the record also supported the
Commission's finding.  See E. Alan Kenny, The Current Status and
Future Outlook of Global Salmon Markets: Implications for
Canadian Salmon Farmers at 49 (November 1996) (in Pl.'s Initial
Apps. 25) (showing that Chile had the highest rate of growth in
farmed salmon production between 1991 and 1995 and that Chile
increased its exports to the United States, accounting for
roughly 56 percent of total U.S. supply by the year 2000).

See Final Br. of Asociación de Productores de Salmón y Trucha de Chile AG in Opp'n to First Remand Determination and in Supp. of Rule 56.2 Mot. for J. on the Agency R. at 38-39.

No bright-line test exists to determine when injury is imminent. Congress, however, is presumed to have used words in their ordinary meaning, absent a contrary expressed intent. See Camargo Correa Metais, S.A. v. United States, 18 Fed. Cir. (T) __, __, 200 F.3d 771, 773 (1999). The Court need not defer to the Commission's interpretation because "Congress's purpose and intent on the question at issue is judicially ascertainable." Timex V.I., Inc. v. United States, 16 Fed. Cir. (T) __, __ , 157 F.3d 879, 881(1998).

Both the dictionary definition and case law from the CIT demonstrate that the statutory term "imminent" only means impending. See The Oxford English Dictionary 685 (2d Ed. 1989)(defining "imminent" as "impending"); see also Goss Graphics, 22 CIT at 1007-1008, 33 F. Supp. 2d at 1103 (finding that the Commission reasonably found imminent harm to domestic industry when financial effects of dumped subject imports would not manifest themselves for two or more years). The term does not necessarily mean, as the Asociación argues, immediate, as the statute does not establish any specific time limit governing when a potential action can be characterized as imminent. In each case the Commission should look at the facts and circumstances of

the industry, product, and marketplace to determine if further dumped or subsidized imports are imminent.

> **2.    The Commission's Conclusion that Subject Producers Would Increase Capacity Utilization is Supported by Substantial Evidence and in Accordance with Law.**

The Commission also found that the capacity utilization levels for all subject producers declined between 1996 and 1997. See View on First Remand at 21. The Commission determined that the subject producers were likely to increase production through the utilization of this unused capacity. See id. It reasoned that they would have incentive to do so because the United States is the largest export market for the subject producers, and U.S. demand is increasing. See id.

This Court has previously recognized that incentives exist for subject producers to expand production when low capacity utilization exists. See Citrosuco Paulista, S.A. v. United States, 12 CIT 1196, 1220, 1221-22, 704 F.Supp. 1075, 1095, 1097 (1988) (upholding Commission finding that increased production capacity, and low utilization levels, would result in increased exports to the United States when, among other things, the United States is a major market for exporting companies). Accordingly, the Court finds the Commission's conclusion that subject producers will increase production through utilization of the unused capacity to be reasonable.

C.   **The Commission's Finding that the Subject Producers Could Substantially Increase Exports to the United States in the Imminent Future by Shifting Production from Other Seafood Products to Salmon is in Accordance with Law and Supported by Substantial Evidence.**

The Commission also found that "subject producers have potential to shift production from other seafood products to salmon." Final Determination at 23.  The Asociación argues that as a matter of law such a finding of "potential" production shift is based on impermissible speculation and cannot support a threat finding.  See Pl.'s Initial Br. at 24.  Further, the Asociación argues that there is no record evidence that subject producers as a whole planned to shift production from other products to salmon.  See id. at 25.  The Court finds that the ITC's consideration of the potential for subject producers to shift from other seafood products to salmon, together with the other record evidence, supports its finding that subject producers would substantially increase exports, and that this finding is not mere conjecture.  In fact, the statute requires the Commission to consider the potential for product-shifting.  See 19 U.S.C. § 1677(7)(F)(i)(VI).

The record evidence supports the Commission's finding that production potentially will shift from other seafood products to salmon.  See Final Determination at 23 n.168.  In fact, the Asociación's own data supports the Commission's conclusion.  The record evidence demonstrates that the Asociación only reported

home market production and shipment of salmon further processed into cut salmon. The record indicates that a significant amount of the Asociación's production in 1997 was processed into frozen or smoked salmon. See Views on First Remand at 9-10. Thus, the Asociación possessed the ability to shift a significant amount of its production from one channel of trade -- smoked and frozen salmon, to another -- cut salmon. See id.; U.S. Steel Group v. United States, 18 CIT 1190, 1222, 873 F. Supp. 673, 701 (1994) (when assessing the risk of product shifting the Commission may look to, among other things, the channels of trade available for such shifting).

Moreover, record evidence demonstrates that the subject producers had an incentive to shift production. Fresh salmon commands a price premium over frozen and smoked salmon. See Views on First Remand at 23. The evidence also shows that there is a "surprisingly low consumption of smoked salmon" in the United States. See Audun Lem & Maria Di Marzio, The World Market for Salmon 33 (GLOBEFISH Research Programme, Vol. 44, FAO) (May 1996) ("GLOBEFISH Research") (in App. to Def. U.S. Int'l Trade Comm.'s Mem. in Opp. to Pl.'s Mot. for J. on the Agency R. ("Def. App.") Conf. List Doc. 13, App. to Pet'r's Pre-hearing Br.). It was reasonable, and not mere conjecture, for the Commission to conclude that Chilean producers would likely shift away from those products with low demand in the United States, namely

smoked salmon, toward salmon cuts, the product with the price
premium.

    **D.    The Commission's Finding that the Subject Producers
Could Substantially Increase Exports to the United
States in the Imminent Future By Shifting Exports From
Other Markets to the United States is in Accordance
with Law and Supported by Substantial Evidence.**

The Commission also supported its positive injury
determination with "evidence that subject producers have
potential to shift . . . exports from other markets to the U.S."
Final Determination at 23. Again, the Asociación claims that
this is mere speculation and that the finding is not supported by
record evidence. See Pl.'s Initial Br. at 25. The Court finds
that the Commission's consideration of the potential for subject
producers to shift products between markets, together with the
other record evidence, supports its positive injury determination
and is not mere conjecture.

As with respect to the issue of product-shifting, see supra,
when considering the record evidence in this context, the Court
must bear in mind that the Commission is only statutorily
mandated to consider whether there is a "potential" for shifting.
See 19 U.S.C. § 1677(7)(F)(i)(VI). The record evidence
demonstrates that salmon producers are able to shift their
production between countries in responses to changes in the
market. See Def. App. Conf. List 13, App. to Pet'r's Pre-hearing
Br., at App. 2 (LECG Economic Report). The Asociación offers no

countervailing evidence; indeed, its own economic analysis suggests that the United States market is more attractive than other markets.  See GLOBEFISH Research at 28-30.  Therefore, the substantial evidence supports the Commission's conclusion that, at a minimum, there is a potential for shifting exports from other markets to the United States.

**II.  The Determinations of Both Commissioners Bragg and Miller are Supported by the Causation Analysis Required by the Statute.**

Under U.S. law, where there is evidence that the U.S. industry is injured, or threatened with injury, by factors other than less than fair value imports, the Commission must consider all relevant economic factors.  19 U.S.C. § 1677(7)(C)(iii); see Gerald Metals, Inc. v. United States, 16 Fed. Cir. (T) __, __, 132 F.3d 716, 722-23 (1997); Suramerica de Aleaciones Laminadas, C.A. v. United States, 13 Fed. Cir. (T) 34, 38-39, 44 F.3d 978, 984 (1994); Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT __, __, 59 F. Supp. 2d 1324, 1329 (1999), aff'd, 19 Fed. Cir. (T) __, 266 F.3d 1339 (2001).  The statute provides that the Commission "shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States . . . ."  19 U.S.C. § 1677(7)(C)(iii).  The Statement of Administrative Action states that the Commission is required to "examine all relevant evidence including any known factors, other than the dumped . . . imports which at the same time are injuring

the domestic industry." Statement of Administrative Action on the Uruguay Round Agreements Act, reprinted in H.R. Doc. No. 103-316(I) (1994) ("SAA") at 851 (internal quotes omitted). The SAA, however, also indicates that in examining other causes of injury, the Commission is not required to isolate the effects of subject imports from other factors contributing to the injury. See id.

In Gerald Metals the Federal Circuit expressly construed the SAA provisions to require analysis of the alternative sources of injury. See 16 Fed. Cir. (T) at __, 132 F.3d at 722-23. The Asociación claims that in this case both Commissioner Bragg and Commissioner Miller failed to comply with this requirement.[15]

### A.    Commissioner Bragg's Determination

The Asociación argues that Commissioner Bragg failed to discuss global market forces as an alternative source of injury. See Pl.'s Initial Br. at 29, 34. In its brief, the Asociación points to numerous pieces of record evidence that it claims establish the existence of such a global market. See id. at 29 n.93.

The Court finds that Commissioner Bragg did not err by declining to explicitly discuss the tangential issue of the

---

[15]The Commission's Final Determination was made in a two to one vote. Final Determination at 1. Commissioners Bragg and Miller's views "comprised the Commission's affirmative determination" in the Final Determination. Views on First Remand at 1. Therefore, the Asociación's separate challenges to the views of Commissioners Bragg and Miller are challenges to the views of the Commission.

global market for salmon. The Commission need not address every issue presented to it. See Dastech Int'l, Inc. v. United States Int'l Trade Comm'n, 21 CIT 469, 476, 963 F. Supp. 1220, 1226 (1997). In fact, the SAA makes clear that the Commission must only "examine all relevant evidence including any known factors, other than the dumped . . . imports which at the same time are injuring the domestic industry." SAA at 851 (internal quotes omitted). The law requires only that the Commission examine alternative causes. "Absent some showing to the contrary, the Commission is presumed to have considered all evidence in the record." Rhone Poulenc, S.A. v. United States, 8 CIT 47, 55, 592 F. Supp. 1318, 1326 (1984). The evidence indicates that Commissioner Bragg declined to address the global market because she did not consider it to be injuring the domestic industry.

The Asociación also charges that in making her injury analysis, Commissioner Bragg failed to distinguish between harm caused by a shift in consumer preference and harm caused by less than fair value imports. See Pl.'s Initial Br. at 37-38 (citing Final Determination at 17, 21). Specifically, the Asociación points to Commissioner Bragg's statement that "once the shift in the market toward cuts and away from whole salmon develops more fully, the domestic industry will experience material injury as subject imports solidify their dominant position in the sale of cuts." See Final Determination at 21.

It is undisputed that there was a consumer shift in preference away from whole salmon to salmon cuts. See Final Determination at 21; Pl.'s Initial App. 3, Commission Final Staff Report, Public Version at C-6. Commissioner Bragg recognized this preference shift. See Final Determination, at 21. Commissioner Bragg's analysis of the relationship between the shift in consumer preference for salmon cuts and the effect of less than fair value imports was permissible. The Asociación claims that Commissioner Bragg failed to differentiate the two causes, but the case law is clear that she was not required to make bright-line distinctions. All Commissioner Bragg was required to do was to consider the alternative causes of injury and determine that the injury was "by reason of" the less than fair value imports. See Gerald Metals, 16 Fed. Cir. (T) at __, 132 F.3d at 722-23. The Commission is not required to isolate the effects of subject imports from other factors contributing to injury. SAA at 851; Taiwan Semiconductor, 23 CIT at __, 59 F. Supp. at 1329 n.9. In this case, by considering the shift in consumer preference to salmon cuts, Commissioner Bragg properly considered a changing condition of competition in the U.S. market as a context within which to analyze injury. By discussing such a context, Commissioner Bragg did not ignore a potential cause of injury.

Commissioner Bragg's discussion of the vulnerability of the domestic market due to a shift in consumer preference was not only permissible, it was required. Congress, in the SAA, makes clear that "[i]n threat determinations, the Commission must carefully assess current trends and competitive conditions in the marketplace to determine the probable future impact of imports on the domestic industry and whether the industry is vulnerable to future harm." SAA at 885. Commissioner Bragg properly recognized that the demand shift, not itself ascribable to subject imports, affects the conditions of competition between increasing subject imports and the domestic industry in the imminent future.

### B.    Commissioner Miller's Determination

The Asociación argues that Commissioner Miller addressed the evidence of global market forces, but failed to do so adequately. See Pl.'s Initial Br. at 35-37. The Asociación argues that Commissioner Miller misunderstood the global price causation theory, claiming that she considered the existence of a global market to guarantee a single global price. See id. The Asociación argues that a global market only guarantees that prices move together or are correlated.

The Court finds that Commissioner Miller's causation analysis was in accordance with law. In her determination, Commissioner Miller addressed the global market causation

argument.  The Asociación's contention that she did not satisfy
the requirement of <u>Gerald Metals</u> has no merit.  <u>See</u> 16 Fed. Cir.
(T) at __, 132 F.3d at 722-23.  She considered the global market
causation theory to be a "relevant factor," explicitly evaluated
it, and dismissed it.  Chairman Miller's analysis therefore
satisfied the requirements of 19 U.S.C. § 1677(7)(C)(iii).  <u>See
generally</u> <u>Final Determination</u> at 31-32 n.214.

## III. Commissioner Bragg's Analysis of the Margin of Dumping is Consistent with the Statutory Scheme and is Supported by Substantial Evidence.

When making an injury determination the Commission is
required to evaluate the magnitude of the dumping margin.  <u>See</u> 19
U.S.C. § 1677(7)(C)(iii)(V) (1994).  The Asociación argues that
Commissioner Bragg failed to adequately consider the margin of
dumping in her analysis.[16]  The Asociación also argues that
Commissioner Bragg's discussion, to the extent that it exists,
misconstrues the statutory scheme and is unsupported by
substantial evidence.  <u>See</u> Pl.'s Initial Br. at 40-48.

Commissioner Bragg did adequately consider dumping margins
in the <u>Final Determination</u>, reciting the margins of dumping found
by Commerce and declining to attach any significance to the
margins in this case.  <u>Final Determination</u> at 20 n.145.  <u>Cf.</u>
<u>Coalition for the Pres. of Am. Brake Drum & Rotor Aftermarket
Mfrs. v. United States</u>, 22 CIT 520, 532, 15 F. Supp. 2d 918, 929

---

[16]<u>See</u> <u>supra</u> note 15.

(1998) ("Coalition") ("[d]espite Plaintiff's allegation, the ITC expressly considered and subsequently determined that the material submitted by Plaintiff was of limited probative value. See Final Determination at 23, n.127").  The Court does not agree with the Asociación that Commissioner Bragg's treatment of the dumping margins was either contrary to the statutory scheme or unsupported by substantial evidence.  The statute mandates that Commissioner Bragg address the dumping margins.  See 19 U.S.C. § 1677(7)(C)(iii)(V).  Here, Commissioner Bragg has done so.  The Asociación alleges that Commissioner Bragg improperly construed the statutory scheme by dismissing the importance of the dumping margins in this particular case.  Besides simply suggesting that her conclusion is wrong, the Asociación offers nothing to support its argument.[17]  Nothing in the statutory scheme compels Commissioner Bragg to reach a certain conclusion concerning the dumping margins -- the statute only compels Commissioner Bragg to consider such margins.  See Coalition, 22 CIT at 523, 15 F. Supp. 2d at 922 (quoting U.S. Steel Group v. United States, 14 Fed.

---

[17]The Asociaion offers Commissioner Crawford's reasoning as evidence of the lack of support for Commissioner Bragg's position.  See Pl.'s Initial Br. at 47; Mitsubishi Materials Corp. v. United States, 20 CIT 328, 331, 918 F. Supp. 422, 425 (1996) ("the reviewing court may not 'even as to matters not requiring expertise . . . displace the [Commission's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo'") (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

Cir. (T) __, __, 96 F.3d 1352, 1362 (1996)); Copperweld Corp. v. United States, 12 CIT 148, 154-60, 682 F.Supp. 552, 560-565 (1988) (broad discretion in discussion of relevant injury factors).

## CONCLUSION

For all of the foregoing reasons, the Court sustains the ITC's Final Determination as modified by the three remand determinations.

_____

**Senior Judge Richard W. Goldberg**

**Date: January 9, 2002**
     **New York, New York**