Slip Op. 07 - 7

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - x
CO-STEEL RARITAN, INC. *et al.*,          :

                    Plaintiffs, :
            v.                            Court No. 01-00955
                                          :
UNITED STATES INTERNATIONAL TRADE
COMMISSION,                               :

                    Defendant.  :
- - - - - - - - - - - - - - - - - - - - x


Opinion & Order


[Result of remand to defendant
 not in accordance with the law.]

                              Decided: January 17, 2007


    Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon and R. Alan Luberda) for the plaintiffs.

    James M. Lyons, General Counsel, and Karen Veninga Driscoll, U.S. International Trade Commission, for the defendant.

    White & Case LLP (David P. Houlihan and Frank H. Morgan) for the intervenor-defendants.


        AQUILINO, Senior Judge:   The Trade Agreements Act of 1979, as amended, 19 U.S.C. §1677(24)(A)(i), provides that imports of merchandise corresponding to a U.S. domestic like product are "negligible" if such imports account for less than three percent of the volume of all such merchandise imported into the United States during a defined 12-month period.   Exceptions to this statutory rule are as follows:

(ii) . . . Imports that would otherwise be negligible under clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all countries described in clause (i) with respect to which investigations were initiated on the same day exceeds 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period.

*   *   *

(iv) Negligibility in threat analysis. Notwithstanding clauses (i) and (ii), the [U.S. International Trade] Commission ["ITC"] shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States, or that the aggregate volumes of imports from all countries described in clause (ii) will imminently exceed 7 percent of the volume of all such merchandise imported into the United States. The Commission shall consider such imports only for purposes of determining threat of material injury.

19 U.S.C. §1677(24)(A). The act further provides that, in computing import volumes for purposes of foregoing subparagraph (A), the ITC may make reasonable estimates on the basis of available statistics. 19 U.S.C. §1677(24)(C).

I

In reviewing agency analyses under the foregoing provisions, a court shall hold unlawful any determination, finding, or conclusion found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.  19 U.S.C. §1516a(b)(1)(A).  See, e.g., Texas Crushed Stone Co. v. United States, 35 F.3d 1535 (Fed.Cir. 1994).  In exercising this statutory standard of review, the courts have sustained negative preliminary determinations of the Commission

> only when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation.

American Lamb Co. v. United States, 785 F.2d 994, 1001 (Fed.Cir. 1986).  And this approach has necessarily been followed at bar *viz.* Co-Steel Raritan, Inc. v. U.S. Int'l Trade Comm'n, 26 CIT 639, 648-49, 244 F.Supp.2d 1349, 1358 (2002); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1310-11 (Fed.Cir. 2004), citing the Uruguay Round Agreements Act Statement of Administrative Action ("URAA-SAA"), H.R. Doc. No. 103-316, vol. 1 (1994).  That statement includes:

> In threat of material injury analyses, the Commission will examine "actual" as well as "potential" import volumes.  Import volumes at the conclusion of the 12-month period examined for purposes of considering negligibility may be below the negligibility threshold, but increasing at a rate that indicates they are likely to imminently exceed that threshold during the period the Commission examines in conducting its threat analysis.  In such circumstances, the [ITC] will not make a material injury determination concerning such imports because they are currently negligible, but it will consider the imports for purposes of a threat determination.

URAA-SAA, p. 856.

A

As reported in this court's subsequent slip opinion 05-63 filed herein, 29 CIT ___ (June 7, 2005), familiarity with which is presumed, the decision of two members of the three-judge panel of the Court of Appeals for the Federal Circuit ("CAFC") in <u>Co-Steel Raritan, Inc. v. Int'l Trade Comm'n</u>, <u>supra</u>, was read to require

> further proceedings . . .[to] consider the contention in [plaintiffs'] original motion for judgment on the administrative record that it did not address in *Co-Steel I* . . . [,] that the Commission erred in concluding in the preliminary determination that there was no reasonable indication that wire rod imports from Egypt, South Africa, and Venezuela would imminently exceed statutory negligibility levels, whether considered individually or collectively.

357 F.3d at 1317.  When the parties hereto did not disagree[1], this court sought to comply with this mandate to consider the "*record as a whole*", "the record at the time the Commission render[ed] its preliminary determination", 357 F.3d at 1314, and the parties' arguments based thereon.  Again as reported, the court strained

> to discern a supposition, let alone clear and convincing evidence, of no potential that imports from South Africa will imminently account for more than three percent of all subject merchandise imported into the United States.[2]

Whereupon the court was constrained to grant plaintiffs' motion for judgment on the agency record

---

[1] <u>See</u> Slip Op. 05-63, p. 2, 29 CIT at ___.

[2] <u>Id</u>. at 12-13 (footnote omitted).

to the extent of remand to the defendant to (a) reconsider its preliminary determination that wire rod imports from South Africa will not imminently exceed three percent of the volume of all such merchandise imported into the United States and (b) pinpoint the clear and convincing evidence on the record, if there is any, that there is little potential that the imports from South Africa and those from Egypt and Venezuela, collectively, will not imminently exceed seven percent.[3]

B

The defendant has sought to comply with this remand, finding subject imports from South Africa, individually, and also aggregated with those from Egypt and Venezuela, to be negligible, so that its antidumping-duty investigations of such imports from those countries "are terminated by operation of law." Views of the Commission, p. 36.

(1)

Slip opinion 05-63 pointed out that, in sustaining the defendant's affirmative threat-of-material-injury determination, the court in Asociacion de Prod. de Salmon y Trucha de Chile AG v. U.S. Int'l Trade Comm'n, 26 CIT 29, 39, 180 F.Supp.2d 1360, 1371 (2002), concluded that the foreign producers' ability to increase shipments to this country "within one to two years" qualified as imminent. The court reasoned that "[n]o bright-line test exists to determine when injury is imminent."

---

[3] Id. at 15.

> . . . The term does not necessarily mean, as the Asocia-
> ción argues, immediate, as the statute does not establish
> any specific time limit governing when a potential action
> can be characterized as imminent.  . . .

26 CIT at 39, 180 F.Supp.2d at 1372.  The defendant now responds

herein:

> The production process and market for steel wire rod
> are quite different than those for salmon. . . . In
> contrast to the several year production cycle for salmon,
> wire rod can be quickly produced and delivered to the
> U.S. market with short lead times. . . . The wire rod
> industry is thus far less constrained than the salmon
> industry in its ability to increase production and
> shipments quickly. . . . In light of the[se]
> circumstances, we find "imminent" encompasses a shorter
> time frame in this case than in Salmon.

Views of the Commission, pp. 16-18.


The Commission examined actual imports of South African

wire rod to again find that

> the ratio of subject imports from South Africa to total
> imports never exceeded 3.0 percent over the period of
> investigation.  It was 1.8 percent in 1998, 2.0 percent
> in 1999, 2.4 percent in 2000, 2.0 percent in interim
> 2000, and 2.6 percent in interim 2001.


Id. at 20-21 (footnote omitted).  It compared total import volumes

during calendar year 2000 and the statutory negligibility period

and finds that they remained "essentially level", id. at 21, and

further notes that overall apparent U.S. wire-rod consumption,

which increased from 1998 to 2000, dropped [] percent between

interim 2000 and interim 2001.  See id. at 22.  The ITC thus

concluded that those data indicated a "decreased demand for wire rod".  Id.

Again comparing data from calendar year 2000 and the statutory negligibility period, the Commission determines that South African subject imports increased "by only 0.14 percentage points, from 2.44 percent to 2.58 percent" during that time.  Id. at 21.  According to it, that percentage supports a finding that the "rate of increase for subject imports from South Africa slowed considerably after calendar year 2000".  Id.  The ITC further determines that "decreased demand for wire rod may have been a factor in th[is] decreased rate of increase for subject imports from South Africa."  Id. at 22.

The Commission points to increased volumes of subject imports from Brazil, Canada, Mexico, and Trinidad and Tobago from 1998 to July 2001, along with those countries' expanding and "increasingly dominant share of total import volumes", as

> ma[king] the [U.S. wire-rod] market more competitive, thereby diminishing the possibility that the volume of subject imports from South Africa would increase materially in the imminent future . . . render[ing] minimal any effect an increase in subject imports from South Africa would have on its share of total imports.

Id. at 25.  The ITC finds the rate of increase of South African imports "much lower" than the rate of increase of imports from those countries. Id. n. 94.

Turning to potential imports, the Commission cites decreased U.S. consumption to support a trend analysis foretelling that this

> decrease in consumption would tend to discourage importers or exporters of wire rod from South Africa from attempting to increase . . . shipments to the U.S. market. . . . [I]f imports were to increase, that increase would be far more likely to consist of subject imports from Brazil, Canada, Mexico and Trinidad and Tobago, rather than subject imports from South Africa.

Id. at 28.  The ITC analyzes the export potentials of the competing countries and finds that certain subsidies, high production capacities, and business strategies *vis-à-vis* the U.S. market make them more likely than South Africa to increase their exports should total U.S. imports of wire-rod increase in the future.  See id. at 28-31.

The Commission examined questionnaire responses from two U.S. importers of South African wire rod and estimated that they accounted for almost all U.S. imports of subject merchandise from that country during 2000.  See id. at 26.  One of them reported an anticipated delivery of subject imports in August 2001, which the ITC finds "d[id] not reflect an intent on the part of [that importer] to materially increase its subject imports from South Africa into the U.S. market in the imminent future."  Id. at 26-27.

The Commission also relies on data provided by the lone responding South African producer, Scaw Metals, Limited, which "did not export to the United States during the period of investigation and stated that it d[id] not plan to do so in the future", id. at 27, to conclude that

> neither the largest responding importer of subject imports, nor the only exporter in South Africa that responded to our questionnaire, gave any indication that they were intending to increase their imports or their exports, respectively, to the U.S. market in the imminent future.

Id. at 28. In light of the above actual and potential import trend analyses, the ITC

> conclude[s] that there is no potential that subject imports from South Africa will exceed the applicable individual statutory negligibility threshold of three percent of total wire rod imports in the imminent future, and that they will remain at approximately 2.6 percent of total imports in the imminent future.

Id. at 32.

(2)

The Commission finds that aggregate imports from Egypt, South Africa, and Venezuela comprised 6.1 percent of subject imports during the applicable negligibility period, "well below the statutory [7 percent] threshold." Id. In reaching this con-clusion, it confirms its earlier findings of the share of total imports for Egypt and Venezuela individually, which were 1.4 percent and 2.1 percent, respectively. By adding these figures to its previously-determined 2.6 percent for South Africa, the ITC concludes that "subject imports from Egypt, South Africa and Venezuela would, in aggregate, account for approximately 6.1 percent of total imports in the immediate future." Id. at 35.

The Commission identifies a trend in support of this conclusion, citing declining aggregate imports from those three countries that totaled 7.5 percent in 1999, 6.4 percent in 2000, 5.6 percent in interim 2000, and 5.1 percent in interim 2001. See id. at 32-33. The determination regarding aggregate imminent non-negligibility is further based upon those same factors it considered in its assessment of individual South African negligibility, namely, its conclusion that the U.S. market has become more competitive, that other foreign producers have a "variety of incentives to increase their presence in the U.S. market", and that, should total imports of wire rod increase, "it is much more likely for that increase to come from countries other than Egypt, South Africa and Venezuela".  Id. at 35-36.

II

The plaintiffs contend that the defendant has erred in concluding that there is no potential that the ratio of South African wire-rod exports to the U.S. would imminently exceed the three-percent negligibility threshold:

> The Commission's remand determination . . . repeats the same errors made in its original decision . . . [and] relies on the same, faulty reasoning cited in its prior decision to support its conclusion that imports from South Africa will not imminently exceed the three percent negligibility threshold.

Plaintiffs' Comments [hereinafter "Brief"], p. 2.  They add that

> [a]dditional information cited by the Commission in its
> remand determination . . . as reported by the major
> importer of product from South Africa . . . <u>demonstrates
> that imports from South Africa not only will exceed the
> three percent threshold, but will do so in just one month
> beyond the period the Commission examined</u>. . . . [That
> entity's] affirmative statement that it will import over
> 17,000 tons of wire rod in the month of August 2001 alone
> is directly inconsistent with the Commission's conclusion
> that "the largest responding importer" did not give "any
> indication that they were intending to increase[] their
> imports . . . to the U.S. in the imminent future."

<u>Id</u>. at 3-4 (emphasis in original; confidential bracketing omitted),

quoting <u>Views of the Commission</u>, p. 28.  The plaintiffs postulate

that, given that shipment, South African subject imports would

exceed three percent during the period of September 2000 through

August 2001.  <u>See</u> <u>id</u>. at 3-6.

Focusing on that shipment, the plaintiffs posit that "the

Commission's . . . definition of 'imminent[]' . . . is irrelevant".

<u>Id</u>. at 6.  They claim that

> [d]efinitive evidence [of] . . . substantial volume of
> imports from South Africa in <u>the very next month</u> beyond
> that for which data were collected that would cause
> imports from South Africa to surpass the three percent
> threshold is "imminent" under any definition of that
> term.

<u>Id</u>. at 6-7 (emphasis in original; confidential bracketing omitted).

The plaintiffs also find fault with the ITC's

interpretation of record evidence.  They contend that its

> theories as to why there would be no increase in future
> imports from South Africa are . . . without support . . .
> [and its] theories as to how imports from South Africa
> would likely react to specific market conditions fly
> directly in the face of record evidence to the contrary.

Id. at 7.  Specifically, they point to an increase in South African subject imports between interim 2000 and 2001, during which period such imports increased 31.5 percent despite an overall 16.6 percent drop in apparent U.S. consumption of wire rod.  See id. at 8.  They maintain that

> there is no support for the Commission's conclusion that
> a decline in demand would cause future imports from South
> Africa to decline.

Id.

The plaintiffs similarly challenge the Commission's conclusion that increased market competitiveness would make it unlikely that South Africa would increase its share of subject imports by asserting that it

> was one of the countries increasing its imports steadily
> and consistently during [the investigative period of 1998
> through interim 2001], even as imports from other
> countries increased. . . . Contrary to the Commission's
> theory, despite the increased competition from other
> imports that occurred over this period, the volume of
> imports from South Africa did not diminish but continued
> to increase in every year from prior levels.

Id. at 8-9 (citations omitted).  Whereupon the plaintiffs conclude that the

constant increases in imports from South Africa in this
highly-competitive market environment indicate that,
irrespective of the competition from other imports,
imports from South Africa will increase in volume as
well. . . .  [T]he increased competition and sales of
imports from other subject countries were not coming at
the expense of imports from South Africa but at the
expense of the domestic industry, whose sales and market
share fell rapidly while the market share of imports from
South Africa and other subject countries increased.

Id. at 9, citing Carbon and Certain Alloy Steel Wire Rod From
Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South
Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela, USITC
Pub. 3456, p. IV-11, Table IV-5 (Oct. 2001).

Additionally, the plaintiffs argue that the contested
determination is flawed due to the Commission's

complete failure to acknowledge or address the refusal of
the major exporter of wire rod from South Africa, Iscor,
to provide any response to its questionnaire[] and its
reliance instead on the largely irrelevant response of a
company that has never exported wire rod to the United
States.

Id.  Because that company, Scaw Metals, which was the only South
African wire-rod producer that responded to the ITC's questionnaires,

never exported wire rod to the United States . . . the
fact that it did not plan to increase exports to the
United States is not surprising or even relevant to the
Commission's analysis. . . .  The petition that was filed
in this case by the domestic industry identified Iscor as
the major exporter of wire rod and alleged dumping by
Iscor, not Scaw Metals. . . .  That Scaw Metals . . . had
no plans to export to the U.S. in the future provides no
evidence, one way or the other, for concluding whether

> Iscor would increase exports of wire rod from South
> Africa in the future.

Id. at 10-11 (citations omitted; emphasis in original).  To remedy

this perceived defect, the plaintiffs suggest that the Commission

> should have either made adverse inferences against Iscor
> for non-compliance, as contemplated by 19 U.S.C. §
> 1677e(b), or postponed until the final proceeding a
> decision on South Africa so that it could further attempt
> to obtain a response from Iscor at that time, consistent
> with the standard in American Lamb[.]

Id. (citation omitted).  They speculate that,

> [i]f Iscor had responded, it might have reported that
> increased exports to the United States were planned for
> the imminent future[,] . . . that it was expanding
> capacity or had excess capacity that would lead to
> increased exports, or that it planned to divert exports
> from its home or third country markets to the United
> States. . . . Instead, this void in the record inured to
> Iscor's benefit . . . [and] has rewarded Iscor's
> recalcitrance by prematurely terminating the case against
> imports from South Africa[.]

Id. at 12-14 (footnote omitted).

The plaintiffs lastly take exception to the ITC's

determination that the aggregate Egyptian, South African, and

Venezuelan subject-import ratio would not imminently exceed seven

percent, and they continue to object to the ITC's determination

that subject Venezuelan imports will not significantly increase in

the imminent future.  They claim that data provided by producer

Sidor indicate that Venezuelan subject imports would have

imminently increased during the second half of 2001[4], thus pushing aggregate imports over the negligibility threshold.

A

In considering "imminent", the defendant has identified several factors that distinguish wire-rod production from that of salmon, namely, the steel industry's ability to increase capacity within a short period of time, its ability to quickly produce and deliver product to the U.S. market, and its ability to shift the use of production equipment from other steel products to wire rod. See Views of the Commission, pp. 16-18.  The ITC noted that, because wire-rod sales are

> made generally either on the spot market or through short-term three month contracts . . . [, t]he wire rod industry is thus far less constrained than the salmon industry in its ability to increase production and shipments quickly.

Id. at 17 (footnote omitted).

---

[4] The court declines reconsideration of the issue of imminent Venezuelan non-negligibility, which was decided by slip opinion 05-63.  The ITC's confirmation on remand of its earlier Venezuelan import ratio determination, and its subsequent reliance thereon in factoring its forecast of aggregate imports, does not open the door to reargument as to whether Venezuelan imports are likely to increase significantly in the imminent future.  Rather, the issue of whether the aggregate import ratio will imminently pass the seven-percent threshold remains at issue only to the extent that the Commission's non-negligibility remand determination regarding South Africa might affect collective imminent non-negligibility.

Given its consideration of the facts and circumstances of production of wire rod, the nature of the industry, and the market therefor, the Commission's conclusion that "imminent" in the case at bar "encompasses a shorter time frame" than the one-to-two-year period in Asociacion de Prod. de Salmon y Trucha is not unreasonable, arbitrary and capricious, or an abuse of discretion.

The plaintiffs contend, however, that the South African import ratio would exceed three percent even within such shorter period, *viz*. by the end of September 2001. Relying on information contained in the ITC's remand papers, plaintiffs' approach would shift the 12-month period contemplated by 19 U.S.C. §1677(24)(A)(i) one month ahead during which a significant shipment of South African wire-rod was predicted. Plaintiffs' arithmetic would then divide the expected higher South African import volume by that of total U.S. wire-rod imports tallied during the statutory period, which would equal some 3.1 percent of total U.S. imports. See Plaintiffs' Brief, p. 5.

While admitting, as they must, that their denominator is a "proxy" due to the lack of a "precise[] . . . amount [of] total import tonnage . . . for the September 2000 through August 2001 period",[5] the plaintiffs posit that their approach

---

[5]  Plaintiffs' Brief, p. 5.

> [a]t the very least . . . provides a strong indication of
> a likely imminent increase in imports from South Africa
> to beyond negligible levels, if not definitive proof of
> this fact.

Id. (confidential bracketing omitted).

The court concurs that the impending August 2001 importation of South African wire-rod necessarily falls within the shorter "imminent" period that the ITC sees fit to apply preliminarily.  Its remand papers, however, fail to consider what impact that shipment would have upon the exceeding-three-percent dispositive issue.  In fact, rather than considering the prospective quantitative impact thereof, the Commission compared it with historic company imports of South African product in 2000 and 2001, which is hardly the proper focus when attempting to gauge the imminent future import ratios contemplated by the statute.  See Views of the Commission, p. 26.

The ITC's reliance on that comparative data, along with its statement that the "modest" August 2001 reported shipment did not reflect an "intent on the part of [that importer] to material-ly increase its subject imports", falls short on another level, to wit, its failure to account for the fact that that importer would only "have known of any additional deliveries in the remainder of 2001 when it submitted its questionnaire response in mid-September

2001"[6], *i.e.*, the last few months of 2001.  That failure leaves open the potential of shipments that would fall within the Commission's amorphous imminence period[7], thus rendering the company-specific analysis and conclusions derived therefrom inherently tenuous.

A similar gap exists in the evidence on the agency record concerning South African wire-rod production and export potential due to Iscor's failure to respond to the ITC questionnaire.  In the absence of data from Iscor, which plaintiffs' petition "identified . . . as the major exporter of [South African] wire rod and alleged dumping"[8], the Commission considered data supplied by Scaw Metals, which accounted for [] percent of South African wire-rod production yet reported no exports to the United States during the period under investigation and projected none in the future.

Despite the absence of a response by South Africa's largest wire-rod producer, plaintiffs' contention that the ITC

_____

[6] Views of the Commission, pp. 26-27 (confidential bracketing omitted).

[7] Although the ITC observed that the company's limited ability to predict future shipments of South African wire "comports with [its] conclusions regarding the appropriate 'immiment' period for this case", ibid. n. 102, the observation does nothing to its chosen imminence period in the matter at bar, that is, less time than the one-to-two-year period considered imminent in Asociacion de Prod. de Salmon y Trucha.

[8] Plaintiffs' Brief, p. 10.

should have drawn adverse inferences against Iscor is not persuasive in light of 19 U.S.C. §1677e(b), which provides:

> **Adverse inferences.** If the . . . Commission . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . ., the . . . Commission . . ., in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. . . .

On its face, this standard is permissive. <u>Cf</u>. URAA-SAA, pp. 869, 870. And the defendant did not err in declining to rely on adverse inferences with regard to Iscor.

Plaintiffs' position concerning the reasonableness of the ITC's reliance on Scaw Metals data, however, is on firmer ground. <u>See</u> Plaintiffs' Brief, p. 11. Although, when making a preliminary determination, the Commission is to use "the information available to it at the time of the determination", 19 U.S.C. §1673b(a)(1), consideration must also be given to whether questionnaire data are "sufficiently complete to provide an accurate characterization of the condition" of an industry and whether "there [is] no likelihood that additional evidence obtained in a final investigation would produce a materially different view of the industry".[9] The

---

[9] <u>Torrington Co. v. United States</u>, 16 CIT 220, 222, 790 F.Supp. 1161, 1166 (1992) (holding that ITC did not abuse its discretion during preliminary review wherein it relied on questionnaire data provided by 25 producers representing a substantial quantum of production).

court concurs that the ITC's reliance upon questionnaire data submitted by Scaw Metals, a producer which apparently had not exported wire rod to the U.S. market and accounts for only [] percent of South African production, amounted to an abuse of discretion. Defendant's remand papers do not articulate why those data are sufficient to properly describe the condition of the South African industry, and this court, on the record presented, cannot do so itself.

Scaw Metals' questionnaire data bear little connection to the Commission's paramount concern, namely, the potential, *vel non*, that rising South African exports would cause that country's U.S. import ratio to imminently exceed the three-percent negligibility threshold. Scaw Metals product did not contribute to any data indicative of either historic or future South African export growth, and its numbers are not probative of the capacity, costs, inventories, or marketing strategies of the industry that produces the unaccounted-for majority of South African product.

The ITC's alternative reliance on data from the affiliated reporting importer, which it found historically accounted for nearly all of the reported imports from South Africa, does not remedy this defect. In addition to its above-mentioned temporal infirmities, that importer data does not identify the potential of South African industry to increase its U.S.-bound

exports and are no substitute for producer data when considering potential South African export growth and its concomitant impact upon the import ratio, which is the statutory focal point of the Commission's negligibility-exception inquiry.

The paucity of producer data hardly supports a conclusion that the South African wire-rod industry has no potential to imminently increase its U.S.-bound exports and constrains the court to conclude that the ITC's view is essentially surmise and conjecture, to wit, that the actual production, capacity[10], inventory, and marketing strategy of South Africa's largest wire-rod exporter would reveal no potential that its U.S. exports would or could significantly increase within the imminent future.[11]  It simply cannot be said that the record on remand shows that "there [is] no likelihood that additional evidence obtained in a final

---

[10] In fact, the Commission Staff Report estimated South African wire rod production capacity to be [] percent during 2000, which was "essentially unchanged in interim 2001."  Staff Report to the Commission on Investigations Nos. 701-TA-417-421 and 731-TA-953-963 (Preliminary) (Oct. 9, 2001), p. II-6.

[11] As the plaintiffs correctly point out, the Commission's reliance upon speculation rather than record evidence "inured to Iscor's benefit."  Plaintiffs' Brief, p. 13.  Additional policy concerns are implicated thereby, in that the speculation would permit the major exporter of South African subject imports named by plaintiffs in their petition to

> avoid answer of a questionnaire . . . [and] benefit from a record (without such response) that might be more favorable . . . lead[ing] to [a] premature termination of an investigation.

Slip Op. 05-63, p. 14 n. 8.

investigation would produce a materially different view of the industry"[12], absent relevant evidence indicative of future imminent export potential of the South African industry.

The ITC's consideration of overall wire-rod import trends does not fill this void. While the results on remand may identify reasons why producers in Brazil, Canada, Mexico, or Trinidad and Tobago might increase U.S.-bound wire-rod exports should domestic demand rise within the imminent future, the Commission does not point to any evidence concerning South African export incentives for comparison. In fact, in adopting this approach, the ITC relied on record evidence concerning those third countries' "ability and incentive to significantly increase their exports to the United States",[13] the same kind of evidence that the record lacks for South Africa. That other countries might increase their exports to the United States in the imminent future does not necessarily preclude South Africa from doing the same thing.

Similarly, lower U.S. demand leading to a diminished rate of increase in South African subject imports bears no rational connection to imminent potential South African import-ratio growth in the absence of a clear and convincing prospective trend of

---

[12] <u>Torrington Co. v United States</u>, 16 CIT at 221, 790 F.Supp. at 1166.

[13] <u>Views of the Commission</u>, p. 28.

imminently declining U.S. demand, which the Commission does not forecast.  Cf. Views of the Commission, p. 31.  Additionally, the causal link connecting declining South African import-ratio growth to declining U.S. demand for wire rod is challenged by the plaintiffs, who cite interim 2001 data which are not accounted for in the ITC results and suggest that the South African industry has the potential to increase wire-rod exports even during periods of declining U.S. consumption.

Viewed as a whole, there is not a sustainable relationship between the facts that the ITC finds on remand and the result that it reaches.  The court is thus constrained to conclude that the Commission's termination of investigation of subject imports from South Africa is not in accordance with the law set forth above that "weight[s] the scales in favor of affirmative and against negative determinations."  American Lamb Co. v. United States, 785 F.2d at 1001. On remand, the defendant does not satisfy the difficult standard of clear and convincing evidence of no potential that imports from South Africa will imminently account for more than three percent of all subject merchandise imported into the United States.

Defendant's remand analysis fails to meet the American Lamb standard in a second respect.  The Views of the Commission indicate that, in reaching them, the ITC erroneously "considered

the evidence for an indication of the affirmative, rather than of the negative." Yuasa-General Battery Corp. v. United States, 12 CIT 624, 626, 688 F.Supp. 1551, 1554 (1988). That is, the Commission on remand has examined the record for an absence of positive evidence showing that South African subject imports would imminently rise, instead of clear and convincing evidence of the opposite, as contemplated by the law, supra, governing this case. See, e.g., Views of the Commission, pp. 2-3 ("we find no evidence on the record that subject imports from South Africa . . . will imminently exceed the applicable negligibility thresholds"); p. 23 (noting that the plaintiffs did not specifically argue that South African imports were targeting the United States); id. n. 88 (stating that the plaintiffs "never argued that 'market sources' anticipated increased subject imports from South Africa"); p. 31 n. 119 ("Plaintiffs did not argue that subject imports specifically from South Africa would imminently exceed the negligibility threshold").

The plaintiffs, on the other hand, have demonstrated that, based on the record such as it still is, a likelihood exists that contrary evidence would arise were a full investigation of South African wire-rod exports to the United States undertaken. In concurring, the court does not weigh the evidence on the record. Rather, per American Lamb, that task again is that of the defendant.

III

Reaching this necessary conclusion, however, further exacerbates the "timewarp"[14] of this case, its "extraordinary procedural posture". Slip Op. 05-63, p. 2. Cf. Views of the Commission, part II (Procedural History). Since, under the Trade Agreements Act of 1979, as amended, there remain two levels of judicial review of ITC determinations, and the CAFC in this case and others[15] adheres to the remedy of remand to the Commission, which approach is not necessarily efficacious, defendant's counsel are hereby directed to attempt to settle and submit on or before January 31, 2007 a proposed order of disposition of the remainder of this case in this Court of International Trade that is not inconsistent with the foregoing opinion.

So ordered.

Decided:  New York, New York
          January 17, 2007


                                    /s/ Thomas J. Aquilino, Jr.
                                         Senior Judge

---

[14]  Slip Op. 05-63, p. 4.

[15]  See, e.g., Nippon Steel Corp. v. United States, 458 F.3d 1345 (Fed.Cir. 2006), and cases cited therein.