TEXAS CRUSHED STONE COMPANY, Parker Lafarge, Inc. and Gulf Coast Limestone, Inc., Plaintiffs–Appellants,

v.

The UNITED STATES, Defendant–Appellee,

and

Vulcan Materials Company, Calizas Industriales del Carmen, S.A., and Vulcan/ICA Distribution Company, Defendants–Appellees.

No. 93–1481.

United States Court of Appeals, Federal Circuit.

Sept. 15, 1994.

Eugene L. Stewart, Stewart & Stewart, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were Terence P. Stewart, James R. Cannon, Jr. and Lane S. Hurewitz.

Shara L. Aranoff, Atty., U.S. Intern. Trade Commission, Office of the General Counsel, Washington, DC, argued for defendant-appellee. With her on the brief were Lyn M. Schlitt, Gen. Counsel and Judity M. Czako, Acting Asst. Gen. Counsel.

O. Thomas Johnson, Jr., Covington & Burling, of Washington, DC, argued for defendants-appellees. With him on the brief were Harvey M. Applebaum, David R. Grace and Thomas O. Barnett.

Before CLEVENGER, Circuit Judge, SKELTON, Senior Circuit Judge, and SCHALL, Circuit Judge.

SCHALL, Circuit Judge.

Appellants, Texas Crushed Stone Company, Parker Lafarge, Inc., and Gulf Coast Limestone, Inc., appeal from the May 25, 1993 judgment of the United States Court of International Trade (CIT), sustaining a negative preliminary determination of the United States International Trade Commission (ITC or agency) under sections 773(a) and 771(4)(C) of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1673b(a), 1677(4)(C) (1988). *Texas Crushed Stone Co. v. United States,* 822 F.Supp. 773 (Ct. Int'l Trade 1993). The ITC determined that there was not a concentration of dumped imports of crushed limestone from Mexico into a regional market comprised of 75 counties in Southeast Texas. We affirm.

## BACKGROUND

### I. *The Statutory Scheme*

One of the purposes of the antidumping statute is to remedy the harm caused by sales of imported merchandise in the United States at less than fair value (LTFV). Consequently, if imported merchandise is being sold, or is likely to be sold, at LTFV and as a result, an industry in the United States is materially injured or threatened with material injury, the statute authorizes the imposition of an antidumping duty on such merchandise. 19 U.S.C. § 1673 (1988).

Antidumping proceedings are normally commenced when interested parties file petitions with the ITC and the International Trade Administration (ITA). 19 U.S.C. § 1673a(b) (1988).[1] Such proceedings involve

---

1. The ITC and ITA are "charged" with administering different parts of the antidumping statute. *See Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 665 n. 6 (Fed.Cir. 1992). The ITC is an independent agency, while the ITA is part of the United States Department of Commerce.

five stages: (1) Within 20 days of the filing of a petition, the ITA decides whether to initiate an investigation. 19 U.S.C. § 1673a(c). An investigation is initiated if the petition alleges the elements necessary for the imposition of a duty and contains information reasonably available to the petitioner supporting the allegations. 19 U.S.C. § 1673a(c)(1). If the ITA finds the petition insufficient, an investigation is not initiated, 19 U.S.C. § 1673a(c)(3), and any investigation initiated by the ITC is terminated. 19 U.S.C. § 1673b(a) (1988).[2] (2) If the ITA does not find the petition insufficient, the ITC must preliminarily determine, within 45 days of the petition filing date, whether there is a reasonable indication that an industry in the United States is materially injured or threatened with material injury. 19 U.S.C. § 1673b(a). If that determination is negative, the investigation is terminated. 19 U.S.C. § 1673b(a). (3) If the ITC finds a reasonable indication of material injury or threat of material injury, the ITA must preliminarily determine, within 160 days of the petition filing date (subject to an extension), whether there is a reasonable basis to believe or suspect that merchandise is being sold, or is likely to be sold, at LTFV. 19 U.S.C. § 1673b(b)(1). An affirmative preliminary LTFV determination by the ITA results in the suspension of liquidation of duties and the posting of bonds for the merchandise. 19 U.S.C. § 1673b(d)(1)–(2). A negative preliminary LTFV determination prevents imposition of those provisional remedies but does not terminate the investigation. (4) Within 75 days of its preliminary determination (subject to an extension), the ITA makes a final determination with respect to the sale of merchandise at LTFV. 19 U.S.C.

§ 1673d(a)(1) (1988). If that final determination is negative, the investigation is terminated. 19 U.S.C. § 1673d(c)(2). (5) If the ITA's final LTFV determination is affirmative, the ITC makes a final determination of material injury. 19 U.S.C. § 1673d(b)(1).[3] If the ITC determines that no injury exists, the investigation is terminated. If the ITC determines that injury exists, the ITA issues an antidumping duty order. 19 U.S.C. § 1673d(c)(2). *See generally American Lamb Co. v. United States,* 785 F.2d 994, 998–99 (Fed.Cir.1986). In this case, the antidumping proceedings were terminated after the ITC made a stage (2) negative preliminary determination.

## II. *Proceedings before the ITC*

On May 20, 1992, appellants filed petitions with the ITC and the ITA alleging that an industry in the United States was materially injured or threatened with material injury by reason of imports of crushed limestone from Mexico at LTFV. *Texas Crushed Stone,* 822 F.Supp. at 774.[4] In due course, the ITC conducted a stage (2) preliminary investigation under 19 U.S.C. § 1673b(a) to determine whether there was a reasonable indication that an industry in the United States was materially injured or threatened with material injury by reason of the subject imports. *Id.* In such an investigation, when defining "industry," the ITC may conduct a regional industry analysis as provided in the statute:

> In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—

2. The ITC may have already initiated an investigation, because within 45 days of the petition filing date the ITC must make a preliminary determination. 19 U.S.C. § 1673b(a).

3. If the ITA's preliminary determination is affirmative, the ITC's final determination must be made within 120 days of that preliminary determination or within 45 days of the ITA's final determination, whichever is later. 19 U.S.C. § 1673d(b)(2). If the ITA's preliminary determination is negative, the ITC's final determination must be made within 75 days of any affirmative final determination by the ITA. 19 U.S.C. § 1673d(b)(3).

4. All of the Mexican crushed limestone at issue in this case came from the Yucatan Peninsula quarry of appellee Calizas Industriales del Carmen, S.A. (Calica), and was imported into the United States by appellee Vulcan/ICA Distribution Company (Vulcan/ICA). *Id.* Appellee Vulcan Materials Company, a domestic operator of limestone quarries throughout the United States, owns interests in Calica and Vulcan/ICA through one of its wholly owned subsidiaries. *Id.* Vulcan/ICA began to import crushed limestone into the United States for use as construction aggregate in 1990. *Id.*

(i) the producers within such market sell all or almost all of their production of the like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

In such appropriate circumstances, material injury, the threat of material injury, or material retardation of the establishment of an industry may be found to exist with respect to an industry even if the domestic industry as a whole, or those producers whose collective output of a like product constitutes a major proportion of the total domestic production of that product, is not injured, if there is a concentration of subsidized or dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury, or if the establishment of an industry is being materially retarded, by reason of the subsidized or dumped imports.

19 U.S.C. § 1677(4)(C) (1988). The regional industry provision was expressly added to the antidumping statute as part of the Trade Agreements Act of 1979. *See* Trade Agreements Act of 1979, Pub.L. No. 96–39, § 771(4)(C), 93 Stat. 144, 177; *see also supra* note 6. In its preliminary investigation, the ITC conducted a regional industry analysis. In so doing, it adopted the region of 75 counties in Southeast Texas (the Southeast Texas Region or region) proposed by appellants, who asked that the case be considered on a regional industry basis. *Texas Crushed Stone*, 822 F.Supp. at 774.

Based on the information obtained during the investigation, the ITC made a negative preliminary determination. *Id.* The ITC determined that there was not a concentration of dumped imports into the Southeast Texas Region. *Id.* The ITC stated that "[w]hile the statute does not define concentration, the [ITC] generally has found concentration of dumped imports at or above 80 percent of total imports into the United States to meet the statutory criterion." *Id.*

at 775. The ITC noted that in 1990, 55.1 percent of imports of crushed limestone from Mexico were imported into the region; in 1991, 59.6 percent; and in the period from January through March 1992, 54.3 percent. *Id.* The ITC concluded that these levels of imports did not satisfy the statutory concentration requirement. *Id.* Because import concentration was not satisfied for the Southeast Texas Region, the ITC did not reach the stage (2) issue of material injury or threat of material injury. *Id.* The ITC stated that a finding of import concentration was a legal prerequisite to an analysis of whether the producers of all or almost all of the production within the market were being materially injured or threatened with material injury. *Id.*

In concluding that the statutory concentration requirement had not been met, the ITC used the "percent of imports" test. Under that test, the ITC considers the percentage of all the dumped imports of a given product (in this case, crushed limestone) that are imported into a particular region. *Id.* at 777. If the region accounts for a sufficiently large percentage of all the dumped imports of that product into the United States in light of the facts of the case, the ITC will find that such imports are concentrated and will proceed to determine whether there is material injury or the threat of material injury. *Id.* Appellants had urged the ITC to use what is referred to as the "ratio of import penetration" test. Under that test, the ITC determines whether there is concentration by considering whether dumped import penetration of a given product (ratio of such imports to consumption) in a particular region is relatively higher in that region than dumped import penetration of that product in the United States as a whole. *Id.*

### III. *Proceedings in the CIT*

Appellants appealed the ITC's negative preliminary determination to the CIT.[5] Before the CIT, appellants contended that the ITC should have used the ratio of import penetration test in analyzing import concen-

---

5. Judicial review in the CIT is available of any negative preliminary determination (stages 1–3), 19 U.S.C. § 1516a(a)(1) (1988), and of any final determination (stages 4 and 5). 19 U.S.C. § 1516a(a)(2) (1988).

tration. *Id.* at 775. Appellants argued that the ITC departed from its prior practice by using only the percent of imports test and by applying a higher numerical cut-off under that test. *Id.* Appellants also asserted that the ITC had failed to apply the proper legal standard in making a preliminary determination, in that it allegedly failed to consider the complete record. *Id.* Finally, appellants contended that the ITC should have considered evidence on the record which demonstrated a threat of material injury. *Id.*

Appellees contended that the ITC's interpretation of 19 U.S.C. § 1677(4)(C) was reasonable. *Id.* at 776. They argued that the ITC has discretion in choosing its method for determining import concentration and that neither the antidumping statute, the regional industry provision, nor ITC practice binds the agency to a precise numerical cut-off in analyzing import concentration. *Id.* They also argued that the ITC had applied the proper legal standard in making a preliminary determination, in that it considered the complete record in analyzing import concentration and that there was no reason for it to believe that contrary evidence would arise in any final investigation. *Id.* Finally, appellees contended that the ITC was not required to consider evidence of material injury or threat of material injury once it found that there was not a concentration of dumped imports into the Southeast Texas Region. *Id.*

As already noted, the CIT sustained the ITC's ruling. *Id.* at 782. The court concluded that the negative preliminary determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* First, the court held that the ITC had reasonably interpreted 19 U.S.C. § 1677(4)(C) as giving it discretion in analyzing regional import concentration and that the ITC was within its discretion in applying the percent of imports test. *Id.* at 779. The court reasoned that the language of 19 U.S.C. § 1677(4)(C) does not define import concentration and that the legislative history of 19 U.S.C. § 1677(4)(C) does not require that the ITC use the ratio of import penetration test when analyzing import concentration. *Id.* at 777. As for appellants' contention that the ITC had departed from its prior practice by applying a higher numerical

cut-off under the percent of imports test, the court concluded that there was not an established prior practice in this regard and stated that Congress had intended for the ITC to base its determinations on the particular facts of each case. *Id.* at 780. The court also rejected appellants' argument that the ITC had failed to apply the proper legal standard in making a preliminary determination, in that it failed to consider evidence that imports into the region might have increased sufficiently to be considered concentrated by the time of the final determination. *Id.* The court noted that the ITC had based its concentration analysis on a complete record and that there was no reason for the ITC to believe that contrary evidence would arise in a final investigation. *Id.* at 781.

Finally, the court rejected appellants' argument that the ITC should have considered evidence relevant to the issue of material injury or threat of material injury. *Id.* The court stated that 19 U.S.C. § 1677(4)(C) sets forth three prerequisites for an affirmative determination under a regional industry analysis: existence of a regional market; concentration of dumped imports into the regional market; and material injury or threat of material injury to producers of all or almost all of the regional production. *Id.* at 777. Because regional import concentration was not satisfied, the ITC could not proceed to the issue of material injury or threat of material injury. Thus, the CIT concluded, there was no need for the ITC to examine evidence relevant only to that issue. *Id.* at 781–82.

## DISCUSSION

### I. *Standard of Review*

■ In reviewing a determination of the ITC, the CIT is governed by the standard of review set forth in 19 U.S.C. § 1516a(b)(1) (1988). Section 1516a(b)(1) provides that the CIT "shall hold unlawful any determination, finding, or conclusion found—(A) ... to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." We, in turn, review a decision of the CIT by applying for ourselves the statute's standard of review to the ITC's determination. *Trent Tube v. Avesta Sandvik Tube,* 975 F.2d 807, 813 (Fed.Cir.1992). Therefore, we must affirm the decision of the CIT in this case,

unless we conclude that the ITC's negative preliminary determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In applying this standard, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although [the] inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971) (citations omitted).

## II. *Analysis*

### A.

■ On appeal, appellants repeat the contentions they made before the CIT. Their principal argument is that the ITC abused its discretion in analyzing "concentration of ... dumped imports" as set forth in 19 U.S.C. § 1677(4)(C) using the percent of imports test. In resolving this issue, we are guided by the following instructions of the Supreme Court:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an adminis-

trative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted). By virtue of its responsibilities under the antidumping statute and its expertise, the ITC is entitled to the benefit of *Chevron* deference. *Suramerica*, 966 F.2d at 665 n. 5.

Our first task is to examine the pertinent statutory language in order to determine whether Congress has "directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. Under 19 U.S.C. § 1677(4)(C), material injury or threat of material injury may be found to exist if "there is a concentration of ... dumped imports" into the regional market. Section 1677(4)(C) does not define "concentration," however, nor does it explain how to determine whether dumped imports are concentrated. Therefore, the plain language of the statute does not provide us with an "unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781, with respect to the question of whether, in conducting its concentration inquiry, the ITC was required to use the ratio of import penetration test.

Neither is the legislative history instructive. *See Suramerica*, 966 F.2d at 667 ("neither the statute nor the legislative history gives specific guidance on how Congress wished this issue to be decided"). Appellants point to language from a Senate Report, while appellees rely upon language in a House Report and in the 1979 Statement of Administrative Action.[6] The Senate Report

---

6. In general, differences between the House and Senate over the meaning of provisions in a bill are resolved by a conference committee, which issues a conference report setting forth a resolution of the differences. The Trade Agreements Act of 1979 (which expressly added the regional industry provision to the antidumping statute) was not subject to the usual conference process, however, because it was presented by the President to Congress pursuant to 19 U.S.C. § 2112(d), (e) (1988). 19 U.S.C. § 2112(d) provides that "[w]henever the President enters into a

trade agreement under this section ..., he shall submit such agreement, together with a draft of an implementing bill ... and a statement of any administrative action proposed to implement such agreement, to the Congress as provided in subsection (e) of this section...." The 1979 Statement of Administrative Action was the last in time of the three pertinent legislative history documents to be considered by Congress and was the only one approved by Congress. *See* 19 U.S.C. § 2503(a) (1988) ("Congress approves the trade agreements ... submitted to the Congress

reads as follows: "The requisite concentration *will* be found to exist in at least those cases where the ratio of the subsidized, or less-than-fair-value, imports to consumption of the imports and domestically produced like product is clearly higher in the relevant regional market than in the rest of the U.S. market." S.Rep. No. 249, 96th Cong., 1st Sess. 83, *reprinted in* 1979 U.S.C.C.A.N. 381, 469 (emphasis added). The House Report, however, states that "concentration *could* be found to exist if the ratio of such imports to consumption is clearly higher in the regional market than in the rest of the U.S. market." H.R.Rep. No. 317, 96th Cong., 1st Sess. 73 (1979) (emphasis added). The 1979 Statement of Administrative Action also uses permissive, as opposed to mandatory, language: "Concentration of subsidized or dumped imports *could* be found to exist if there is a clearly higher ratio of such imports to consumption in such market than the ratio of such imports to consumption in the remainder of the United States market." H.R. Doc. No. 153, Part II, 96th Cong., 1st Sess. 388, 432 (1979), 1979 U.S.C.C.A.N. 698 (emphasis added).

Clearly, the language from the legislative history does not reveal an expressed intent on the part of Congress that the ratio of import penetration test be used in determining whether there is a concentration of dumped imports in a particular region. The most that can be said is that the legislative history contains conflicting statements on whether concentration of dumped imports must be found when there is a higher ratio of such imports to consumption in the regional market than in the rest of the United States market. One source states that, in such a situation, concentration "will be found," while two other sources, one of which was approved by the Congress, *see supra* note 6, state that, in such a situation, concentration "could be" found. Under these circumstances and in view of the absence of any guiding language in the statute itself, we must conclude that Congress has not "unam-

biguously" expressed an intent on the question of what test is to be used in determining whether there has been a concentration of dumped imports in a particular region. Consequently, we must defer to the ITC's interpretation of the statutory provision in question—as represented by the approach it used in this case—unless we find such interpretation to be unreasonable.

▮ Preliminarily, we note appellants' argument that the ITC's use of the percent of imports test in this case is not entitled to deference because the ITC departed from its practice in prior determinations by using only the percent of imports test and by applying a higher numerical cut-off under that test.[7] We disagree.

The ITC's approach in this case was not inconsistent with its prior practice. The ITC has generally used the percent of imports test in analyzing import concentration. *See Texas Crushed Stone*, 822 F.Supp. at 777. It has used the ratio of import penetration test only in particular circumstances, such as when the imports outside the region were widely dispersed or when the regional industry accounted for a significant portion of the total national industry, and only after considering concentration under the percent of imports test. *See id.*

In addition, the ITC has never adopted a precise numerical cut-off in analyzing import concentration under the percent of imports test. The ITC has found sufficient concentration where the percentage of imports in the region is 80 percent or more. *See, e.g., Portland Hydraulic Cement from Australia and Japan,* Inv. Nos. 731–TA–108 and 109 (Final), USITC Pub. 1440 (1983) (99 percent); *Sugars and Sirups from Canada,* Inv. No. 731–TA–3 (Final), USITC Pub. 1047 (1980) (96 percent). At the same time, the ITC has usually found insufficient concentration where the percentage was below 80 percent. *See, e.g., Certain Welded Carbon Steel Pipes*

---

on June 19, 1979, and the statements of administrative action proposed to implement such trade agreements submitted to the Congress on that date.").

7. Prior agency practice is relevant in determining the amount of deference due an agency's

interpretation. An agency's interpretation of a relevant provision which conflicts with the agency's earlier interpretation is "entitled to considerably less deference" than a consistently held agency view. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987).

*and Tubes from Taiwan,* Inv. No. 731–TA–211 (Final), USITC Pub. 1994 (1987) (66.3 to 79.2 percent insufficient); *Certain Welded Carbon Steel Pipes and Tubes from the Philippines, and Singapore,* Inv. Nos. 731–TA–293, 294 and 296 (Final), USITC Pub. 1907 (1986) (69.2 to 80.1 percent insufficient). However, the ITC has found import concentration at lower levels. *See Certain Steel Wire Nails from the Republic of Korea,* Inv. No. 731–TA–26 (Final), USITC Pub. 1088 (1980) (43 percent sufficient). In short, the ITC's record in this area is one of an individualized case-by-case method of analysis. There is no merit to the argument that the ITC departed from such an approach in this case.

■ Turning to the question of whether the ITC's interpretation of the statute was reasonable and whether the ITC properly exercised its discretion in applying the percent of imports test, we observe that the ITC's case-by-case approach in analyzing import concentration in a region takes into account the competing interests reflected in the antidumping statute. The statute allows the ITC to find injury based upon a regional analysis in appropriate circumstances. This is because a national analysis can obscure significant injury that may fall disproportionately on an isolated region. However, antidumping duties assessed on the basis of injury to a regional industry are applicable not only to that region, but also to the rest of the United States. *See Gray Portland Cement and Cement Clinker from Venezuela,* Inv. Nos. 731–TA–519, 303–TA–21 (Prelim.), USITC Pub. 2400 (1991) (views of Commissioners Lodwick and Newquist) (concern that "regional analysis be utilized only in appropriate circumstances in order to prevent imposing duties on imports sold in the entire national market in cases in which the detrimental impact of the imports is limited to a small segment of that market").

We believe the ITC's case-by-case approach represents a "legitimate policy choice[ ] made by the agency in interpreting and applying the statute." *Suramerica,* 966 F.2d at 665. Under that approach, the ITC uses the ratio of import penetration test only in particular circumstances, such as when the imports outside the region are widely dispersed throughout the rest of the country or

when the regional industry accounts for a significant portion of the total national industry, and only after analyzing concentration under the percent of imports test. *See Texas Crushed Stone,* 822 F.Supp. at 777. The ITC uses the ratio of import penetration test in such circumstances because the imposition of duties on the subject imports is less likely to disrupt trade outside the region if imports are widely dispersed, and the justification for relief is stronger if the regional industry accounts for a significant portion of the total national industry.

In this case, imports of crushed limestone outside the Southeast Texas Region were not widely dispersed, but were found overwhelmingly in the 10–state Mississippi River/Gulf Coast region. *Id.* at 779. The imposition of antidumping duties based upon an analysis of injury to a small region of Texas would pose a risk of disrupting trade in the rest of the country, namely the 10–state Mississippi River/Gulf Coast region. As just seen, in such circumstances, the ITC typically uses the percent of imports test and declines to use the ratio of import penetration test. We hold that the ITC acted reasonably and did not abuse its discretion in applying the percent of imports test in this case.

### B.

■ Finally, appellants contend that the ITC's ruling was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the ITC violated the legal standard for making a negative preliminary determination set forth in *American Lamb,* 785 F.2d at 1001. As they did before the CIT, appellants argue that the ITC failed to consider relevant evidence that imports into the region might have increased sufficiently to be considered concentrated by the time of the final determination. Appellants also contend that the ITC failed to consider evidence of material injury and threat of material injury. Appellants' contentions are without merit.

As noted above, in a preliminary antidumping investigation, the ITC must determine whether there is a *reasonable indication* that an industry in the United States is materially injured, or threatened with material injury.

 

19 U.S.C. § 1673b(a) (1988) (emphasis added). In *American Lamb,* 785 F.2d at 1001, this court upheld the ITC's practice of making negative determinations under the "reasonable indication" standard in preliminary investigations when: "(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." In this case, the ITC based its concentration analysis on the complete record. We agree with the CIT that there was no reason for the ITC to believe that contrary evidence would arise in a final investigation. *Texas Crushed Stone,* 822 F.Supp. at 781. As we noted in *American Lamb,* "[t]he statute calls for a reasonable indication of injury, not a reasonable indication of need for further inquiry." *American Lamb,* 785 F.2d at 1001.

■ As for appellants' contention that the ITC should have considered evidence of material injury or threat of material injury, the statute provides, in pertinent part, that in the case of a regional industry, material injury or the threat of material injury may be found "if there is a concentration of ... dumped imports into such an isolated market *and* if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury ...,, by reason of the ... dumped imports." 19 U.S.C. § 1677(4)(C) (1988) (emphasis added). Thus, both concentration and material injury or the threat of material injury are prerequisites that must be met for an affirmative determination under a regional industry analysis. Here, the ITC determined that the requirement of concentration of dumped imports into the regional market was not satisfied. Under these circumstances, it could not proceed to the issue of material injury or threat of material injury. Accordingly, there was no need to examine evidence relevant only to that issue.

### CONCLUSION

The ITC's negative preliminary determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Therefore, we affirm the judgment of the CIT sustaining that determination.

### COSTS

Each party shall bear its own costs.

AFFIRMED.