Slip Op. 05 - 63

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - x
CO-STEEL RARITAN, INC. *et al.*,          :

                      Plaintiffs, :

          v.                        :    Court No. 01-00955

UNITED STATES INTERNATIONAL TRADE    :
COMMISSION,
                                    :
                      Defendant.
- - - - - - - - - - - - - - - - - - - x

Opinion & Order

[Remand to the defendant in aftermath of its
 joinder in intervenor-defendants' appeals
 to the CAFC.]

                                Decided: June 7, 2005

Appearances[1]:

     Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, R. Alan Luberda and John M. Herrmann) for the plaintiffs.

     Lyn M. Schlitt, General Counsel, James M. Lyons, Deputy General Counsel, and Karen Veninga Driscoll, U.S. International Trade Commission, for the defendant.

     Baker & McKenzie (Kevin M. O'Brien, Thomas Peele and Kristi K. Hansen) for intervenor-defendant Alexandria National Iron and Steel Company.

     White & Case LLP (David P. Houlihan, Lyle B. Vander Schaaf, Frank H. Morgan, Joseph H. Heckendorn and Jonathan Seiger) for intervenor-defendant Siderurgica del Orinoco, C.A. ("Sidor").


          AQUILINO, Senior Judge:    The intervernor-defendants,

joined on appeal by the defendant, apparently persuaded two members

_____

     [1] The names set forth, necessarily, are those of counsel who contributed to final resolution of this case before this court per slip opinion 02-59, 26 CIT 639, 244 F.Supp.2d 1349 (2002), and slip opinion 02-113, 26 CIT 1131 (2002), and whose submissions then must be revisited now, given the mandate of the court of appeals in conjunction with Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294 (Fed.Cir. 2004).

of a three-judge panel of the Court of Appeals for the Federal Circuit ("CAFC") to vacate this court's final judgment herein, if not remand to the undersigned for

> further proceedings . . .[to] consider the contention in [plaintiffs'] original motion for judgment on the administrative record that it did not address in *Co-Steel I* . . . [,] that the Commission erred in concluding in the preliminary determination that there was no reasonable indication that wire rod imports from Egypt, South Africa, and Venezuela would imminently exceed statutory negligibility levels, whether considered individually or collectively.

Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1317 (Fed.Cir. 2004).

I

This mandate, having made this case's "extraordinary procedural posture"[2] more unique, caused this court to call upon counsel for possible, further guidance.  Their reactions were, respectfully, to require this opinion, *e.g.*:

> Accordingly, at this point, the Court must resolve the remaining issue that was not previously addressed in this action - that is, the question of whether subject imports from the three countries, either individually or collectively, would imminently exceed statutory levels. That issue has been fully briefed by the parties and was subject to extensive discussion during the oral argument before this Court held on June 20, 2002.

Letter of Collier Shannon Scott, PLLC, p. 1 (May 2, 2005).

---

[2] Carbon and Certain Alloy Steel Wire Rod From Brazil, Canada, Germany, Indonesia, Mexico, Moldova, Trinidad and Tobago, Turkey, and Ukraine, USITC Pub. 3546, pp. 47, 49 (Oct. 2002)(Additional and Dissenting Views of Commissioner Lynn M. Bragg).  See, e.g., Georgetown Steel Co. v. United States, 29 CIT ___, Slip Op. 05-43 (April 1, 2005).

But this entails a perception of the future, which is now past. That is, this case contested defendant's preliminary determination that imports of steel wire rod from Egypt, South Africa and Venezuela that were alleged to be sold in the United States at less than fair value were negligible and therefore that its investigations with regard to those countries be terminated. <u>Carbon and Certain Alloy Steel Wire Rod From Brazil, Canada, Egypt, Germany, Indonesia, Mexico, Moldova, South Africa, Trinidad and Tobago, Turkey, Ukraine, and Venezuela</u>, 66 Fed.Reg. 54,539 (Oct. 29, 2001). The period of those investigations was August 2000 through July 2001. And plaintiffs' motion for relief timely interposed thereafter argued, among other things, (i) that defendant's reliance upon data that were not available to them preceding the filing of their petition was unlawful; (ii) that defendant's conclusion that certain imports in question did not exceed in the aggregate seven percent of all imports during the period of investigation was erroneous; and (iii) that its determination that imports from Egypt, South Africa and Venezuela would not imminently exceed the statutory negligibility thresholds was arbitrary and capricious.

The court's slip opinion 02-59 herein, 26 CIT 639, 244 F.Supp.2d 1349 (2002), denied relief as to point (i) but, as to the second point, remanded to the defendant for reconsideration of its termination of those investigations in the light of the Interna-

tional Trade Administration ("ITA"), U.S. Department of Commerce's related Notice of Preliminary Determination of Sales at Less Than Fair Value:  Carbon and Certain Alloy Steel Wire Rod from Germany 67 Fed.Reg. 17,384 (April 10, 2002).  Neither that slip opinion 02-59 nor the court's subsequent slip opinion 02-113, 26 CIT 1131 (2002), which affirmed the results of that remand, reached or otherwise resolved plaintiffs' third point regarding the threat of surpassing negligibility thresholds.

As indicated, defendant's determination, as well as that of the ITA, were both preliminary, which, of course, meant before or in preparation for the main or final result and which was a factor of the foregoing opinions.  Threat also connotes timing; it portends the future, which in this case, to repeat, is now part of history.

                                      II

Be the timewarp as it is, this court's review is still based exclusively upon defendant's administrative record, as developed on or about October 2001.  The statute governing its investigations provided in part:

    (24) Negligible imports

        (A) In general

            (i) Less than 3 percent

                Except as provided in clauses (ii) and
                (iv), imports from a country of merchandise
                corresponding to a domestic like product iden-

tified by the Commission are "negligible" if such imports account for less than 3 percent of the volume of all such merchandise imported into the United States in the most recent 12-month period for which data are available that precedes --

    (I) the filing of the petition . . . or

    (II) the initiation of the investigation . . ..

(ii) Exception

    Imports that would otherwise be negligible under clause (i) shall not be negligible if the aggregate volume of imports of the merchandise from all countries described in clause (i) with respect to which investigations were initiated on the same day exceeds 7 percent of the volume of all such merchandise imported into the United States during the applicable 12-month period.

       \*   \*   \*

(iv) Negligibility in threat analysis

    Notwithstanding clauses (i) and (ii), the Commission shall not treat imports as negligible if it determines that there is a potential that imports from a country described in clause (i) will imminently account for more than 3 percent of the volume of all such merchandise imported into the United States, or that the aggregate volumes of imports from all countries described in clause (ii) will imminently exceed 7 percent of the volume of all such merchandise imported into the United States.  The Commission shall consider such imports only for purposes of determining threat of material injury.

       \*   \*   \*

(C) Computation of import volumes

In computing import volumes for purposes of subparagraph[] (A) . . . , the Commission may make reasonable estimates on the basis of available statistics.

19 U.S.C. §1677(24).  Defendant's analysis under subsection 1677(24)(A)(iv) has been reported as follows:

> *Egypt*. The share of subject imports accounted for by Egyptian wire rod for the period August 2000 - July 2001 was 1.4 percent.  Egyptian subject imports' share of total imports was 2.0 percent in 1998, 0.8 percent in 1999, and 1.2 percent in 2000; the share was 0.9 percent in interim 2001.[]  Capacity utilization for the Egyptian industry was at *** percent in 2000, and is *** in both 2001 and 2002.[]  Inventories in Egypt ***.[]  Given Egypt's very small share of total imports, *** level of capacity utilization, and ***, we conclude that subject imports from Egypt will not imminently exceed three percent of total imports.

> *South Africa*.  During August 2000-July 2001, subject imports from South Africa accounted for 2.6 percent of total imports.  South African subject imports' share of total imports was 1.8 percent in 1998, 2.0 percent in 1999, and 2.4 percent in 2000; the share was 2.6 percent in interim 2001.[][]  Although imports from South Africa have increased over the period of investigation, and were higher in interim 2001 as compared to interim 2000, they have remained well under the three percent threshold throughout the period of investigation.  The record does not suggest that they will exceed that threshold in the imminent future.[]  Given South Africa's import share for the period August 2000-July 2001, 2.6 percent, and that its import share has not exceeded three percent at any time during the period of investigation, we find that South Africa's share of total imports will not imminently exceed three percent.

> *Venezuela*.  Venezuelan subject imports' share of total imports was 2.1 percent for the period August 2000 - July 2001.  Venezuelan subject imports' share of total imports was 1.6 percent in 1998, 4.6 percent in 1999, and 2.7 percent in 2000; the share was 1.5 percent in interim 2001.[]  The volume of subject imports from Venezuela has decreased since its peak in 1999, and the volume of subject imports from Venezuela was significantly lower in interim 2001 (20,724 short tons) than in interim 2000 (48,440 short tons).[]  Venezuelan production capacity was *** in 2000, and is projected to *** in 2001 and 2002.[]  Inventories in Venezuela fell from 1998 to 2000, although they were higher in interim 2001 compared with interim 2000.[]  Given Venezuela's import share, decreasing volumes, *** capacity levels and *** inventories, we find

that Venezuela's share of total imports will not immi-
nently exceed three percent.[]

Aggregate. Given that we have found there is little
potential for significant growth in the share of imports
by any of the three subject countries, we conclude that
the aggregate share of these three countries, which was
6.1 percent for the period August 2000-July 2001, will
not imminently exceed seven percent. Accordingly, pur-
suant to section 733(a)(1),[] the antidumping duty
investigations for Egypt, South Africa, and Venezuela are
terminated by operation of law.

USITC Pub. 3456, pp. 9-11 (Oct. 2001) (footnotes and confidential

data omitted).

The plaintiffs consider this analysis to be arbitrary and

capricious, an abuse of discretion, and otherwise not in accordance

with law. They argue that the volume of imports from South Africa

and Venezuela will imminently exceed three percent each. They al-

so project an aggregate volume exceeding seven percent for the

imports from the three countries combined.

In American Lamb Co. v. United States, 785 F.2d 994, 1001

(Fed.Cir. 1986), the court opined that a negative preliminary

determination under the foregoing statute issue

only when (1) the record as a whole contains clear and
convincing evidence that there is no material injury or
threat of such injury; and (2) no likelihood exists that
contrary evidence will arise in a final investigation.

That opinion was reaffirmed in this matter per Co-Steel Raritan,

Inc. v. Int'l Trade Comm'n, 357 F.3d at 1310, quoting the Uruguay

Round Agreements Act, Statement of Administrative Action ("SAA"),

H.R. Doc. No. 103-316, vol. 1, p. 857 (1994), to wit:

. . . The Commission's standard regarding negligible imports in preliminary investigations shall be the same as its standard for material injury determinations in these investigations, as set forth in *American Lamb Co. v. United States*, 785 F.2d 994 (Fed.Cir. 1986).

In doing so, the court stressed the need to examine the "record as a whole", "the record at the time the Commission renders its pre-liminary determination".   357 F.3d at 1314.

A

Examination of that record at bar as a whole does not reveal any potential that imports from Egypt could have imminently accounted for more than three percent of the volume of all subject merchandise imported into the United States.

B

With regard to imports from Venezuela, the plaintiffs contend that the defendant

discounted projected increases in exports in 2001 by Sidor because it found that interim data for the imports in the first half of 2001 were lower than data for the comparable period of 2000.  See List 1, Doc. 55 at 10-11 n. 54; List 2, Doc. 32 at 16 n. 54 (App. 1).

Plaintiffs' Brief, p. 35.  Accepting this contention as correct[3],

---

[3] See USITC Pub. 3456, pp. 10-11 n. 54 (Oct. 2001):

The Commission has received data from Venezuelan producer and respondent Sidor . . ., which accounted for *** percent of 2000 imports from Venezuela to the United States, according to official Commerce statistics. . . . Sidor reported projected increased exports to the United States in 2001 and 2002 (*** short tons in 2001, and *** short tons in 2002). . . . Actual 2001 interim import

(footnote continued)

however, does not amount to abuse of the discretion that permits the defendant to "make reasonable interpretations of the evidence and to determine the overall significance of any particular factor or piece of evidence".  Maine Potato Council v. United States, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985).  Moreover, it is

> beyond cavil that the Commission is entitled to supple-ment information from official statistics with the information that it gathers during its own investigation, and -- after weighing the evidence -- to choose to rely upon one set of facts over the other.  Indeed, the Commission routinely relies on information it gathers in the course of its investigations, even when that data conflict[] with other official statistics on the record; and the Commission has been repeatedly upheld when it has done so.  *See*, *e.g.*, Texas Crushed Stone Co. v. United States, 17 CIT 428, [438,] 822 F.Supp. 773, 781 (1993), *aff'd*, 35 F.3d 1535 (Fed.Cir. 1994) . . ..

Al Tech Specialty Steel Corp. v. United States, 27 CIT __, __, Slip Op. 03-164, p. 22 (Dec. 16, 2003).  As indicated above, the defendant did not rely solely on the finding of decreasing volume, it also found support in data concerning production capacity and inventory levels.  In short, it cannot be said that the agency did not articulate a "rational connection between the facts found and the choice made".  Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962).  And, not-withstanding the exporter's estimates and plaintiffs' proposed

---

data, however, show significantly lower levels in 2001 than the comparable period in 2000.  In 2000, there were 84,957 short tons of subject imports from Venezuela, accounting for a 2.7 percent share of total imports.

Citations and confidential data omitted.

calculations based thereon, the court is constrained to "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned".  Id. at 286, citing Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945).  See also Ceramica Regio- montana, S.A. v. United States  , 810 F.2d 1137, 1139 (Fed.Cir. 1987); Caribbean Ispat Ltd. v. United States, 29 CIT ___, ___, Slip Op. 05-37, p. 13 (March 22, 2005), appeal docketed, No. 05-1400 (Fed.Cir.  May 25, 2005).

C

That seemingly-descending path from Venezuela, however, is a short one that does not reach the ascending imports from South Africa.  In reporting that the "record does not suggest that they will exceed th[e] threshold in the imminent future", the defendant apparently relied on those imports "hav[ing] remained well under the three percent threshold throughout the period of investiga- tion", repeated two sentences later *viz*. "its import share has not exceeded three percent at any time during the period of investiga- tion".  USCIT Pub. 3456, p. 10.  The plaintiffs disagree and direct this court's attention to that part of the record reflecting the increasing import volumes of 1.8 percent in 1998, 2.0 percent in 1999, 2.4 percent in 2000, and 2.6 percent in interim 2001, arguing that

> [n]othing in the import statistics referenced or other-
> wise in the record provides any reason to believe that
> the  increasing  import  trends  observed  would  reverse
> themselves or cease.

Plaintiffs' Brief, p. 39.

The court cannot disagree with this thesis.  Indeed, the defendant only cursorily acknowledges the increasing rate of imports.  In view of that obvious trend, the court cannot and therefore does not accept as controlling the simple fact that they have not yet exceeded the negligibility threshold.  Although a commissioner in another investigation cautioned that the agency is without a clear statutory directive in assessing imminent non-negligibility[4], she did point out that the "SAA . . . indicates that rates of import growth can be examined"[5], to wit:

> . . . Import volumes at the conclusion of the 12-month period examined for purposes of considering negligibility may be below the negligibility threshold, but increasing at a rate that indicates they are likely to imminently exceed that threshold during the period the Commission examines in conducting its threat analysis.[6]

While it is generally within defendant's discretion to weigh different factors as it deems appropriate, that authority necessarily is based upon the existence of more than one factor, which is not this case, wherein the plaintiffs attempt to fill the

---

[4] Stainless Steel Wire Rod From Germany, Italy, Japan, Korea, Spain, Sweden, and Taiwan, USITC Pub. 3126, p. 36 (Sept. 1998) (Additional and Consenting Views of Commissioner Carol T. Crawford)("While 'imminent' clearly indicates a forward-looking analysis, there is no specific guidance from the statute").

[5] Id.

[6] SAA, p. 856.  It appears as if some factors considered by commissioners derive from those found in 19 U.S.C. §1677(7)(F), which help determine threat of material injury.  See, e.g., Nippon Steel Corp. v. United States, 29 CIT ___, ___, Slip Op. 05-38, pp. 5-10 (March 23, 2005), appeal docketed, No. 05-1404 (Fed.Cir.  May 27, 2005).

void in defendant's analysis by extrapolating from the raw data,

indicative of the increasing rate of imports, volume projections of

their own.  In estimating the denominator in the applicable ratio,

they annualize total imports from interim 2001 and thus, as pointed

out by the defendant, do not account for putative increases in

South African exports.  For the first time, the defendant offers an

approach of its own, stating that,

> in the event that the Court wishes to consider Plain-
> tiffs' claim that imports from South Africa will increase
> at thirty percent per annum, because they have done so
> historically from 1998 to 2000, the Court should also
> take into consideration the historic increase over that
> period in overall import volume.  Plaintiffs' calcula-
> tions do not take into account that overall imports in-
> creased at an average rate of approximately 11 percent
> per year from 1998 to 2000. . . .  If South African
> imports increased by thirty percent in 2001 relative to
> 2000 levels, as they have done from 1998 to 2000, they
> would be 98,036 short tons (approximately 20,000 tons
> higher than 2000 levels).  If overall import levels
> increased 11 percent from 2000 to 2001 as they have done
> from 1998 to 2000, they would equal 3,436,239 short tons.
> Imports from South Africa of 98,036 short tons would
> comprise 2.8 percent of overall imports . . ..

Defendant's Opposition Memorandum, p. 46 n. 98.  In their reply,

the plaintiffs maintain that even

> if the Commission's proposed denominator is used in lieu
> of the annualized figure that the domestic industry
> relied upon, a significant increase in the import share
> for South Africa is also apparent.

Plaintiffs' Reply Brief, p. 25 n. 19.  The court concurs.

        When considering the record evidence, such as it is, in

this light, the court strains to discern a supposition, let alone

clear and convincing evidence, of no potential that imports from South Africa will imminently account for more than three percent of all subject merchandise imported into the United States.[7]  A rough estimate makes it only a matter of a year or two before the three-percent threshold could be exceeded.

That this timeframe falls within the meaning of imminent finds support in case law.  In sustaining defendant's affirmative threat-of-material-injury determination, the court in <u>Asociacion de Prod. de Salmon y Trucha de Chile AG v. U.S. Int'l Trade Comm'n</u>, 26 CIT 29, 39, 180 F.Supp.2d 1360, 1371 (2002), concluded that the producers' ability to increase shipments to this country "within one to two years" qualified as imminent.  The court reasoned that "[n]o bright-line test exists to determine when injury is imminent."

> . . . The term does not necessarily mean, as the Asociación argues, immediate, as the statute does not establish any specific time limit governing when a potential action can be characterized as imminent.

26 CIT at 39, 180 F.Supp.2d at 1371-72.

The defendant apparently does not consider this interpretation of imminent to fit the facts herein, maintaining that "[t]here is no indication in the record that imports from South Africa will 'imminently' jump to three percent".  Defendant's Opposition Memorandum, p. 46.  Such a "jump", however, is evident on

---

[7] Acknowledging Commissioner Bragg's dissenting view that they would imminently do just that, the majority itself noted "sharply increasing trends over the period reviewed".  USITC Pub. 3456, p. 9 n. 43.

the record developed.[8]  Simply concluding that the fact that those

---

    [8] In its Views, the majority notes that the

    Commission only received information from one out of
    three producers of wire rod in South Africa, Scaw Metals.
    Scaw Metals reported that it accounted for *** percent of
    South African production of wire rod, and did not export
    to the United States during the period examined.  . . .
    Scaw Metals is not operating at a high level of capacity
    utilization, and its production is projected to increase
    *** in 2001 and 2002.  However, it is projecting in-
    creased shipments to non-U.S. markets, and does not pro-
    ject that it will begin exporting to the United States.

Id. at 10 n. 48 (citation and confidential data omitted).

    While projecting increased exports to other markets does not
necessarily bolster a trend of increasing U.S. imports, such ca-
pacity to ship elsewhere is certainly not inconsistent therewith.

    Furthermore, the court does not now need to address whether
the lack of questionnaire responses on behalf of other South
African exporters should have precluded a determination that "no
likelihood exists that any contrary evidence will arise in a final
investigation".  Plaintiffs' Brief, p. 41, quoting American Lamb
Co. v. United States, 785 F.2d 994, 1001 (Fed.Cir. 1986)(emphasis
in original).  On its face, SAA is permissive of incomplete infor-
mation in deciding negligibility:

        The Commission will continue its current practice of
    determining negligibility on the basis of each like
    product that it designates in an antidumping or
    countervailing duty investigation.  To make such a deter-
    mination, the Commission will need information concerning
    the volume of total imports in addition to the volume of
    imports from the country(ies) subject to the investi-
    gation.  The Commission may not have access to either
    complete questionnaire data or official import statistics
    conforming exactly to the Commission's like product(s)
    designations, particularly in preliminary investigations.
    Therefore, . . . [1677](24)(C) permits the Commission to
    make reasonable estimates on the basis of available
    statistics.

SAA, p. 856.  Sound policy, however, does not permit a respondent
to delay or avoid answer of a questionnaire in an attempt to
benefit from a record (without such response) that might be more
favorable, and even lead to premature termination of an
investigation.

from South Africa did not actually exceed three percent during the period of investigation is a better indicator of the future than their increasing rate over recent years does not comport with the kind of reasonable estimates contemplated by the statute, <u>supra</u>.

III

In view of the foregoing, plaintiffs' motion for judgment on the agency record must be granted to the extent of remand to the defendant to (a) reconsider its preliminary determination that wire rod imports from South Africa will not imminently exceed three percent of the volume of all such merchandise imported into the United States and (b) pinpoint the clear and convincing evidence on the record, if there is any, that there is little potential that the imports from South Africa and those from Egypt and Venezuela, collectively, will not imminently exceed seven percent.  The defendant may have until September 9, 2005 to carry out this mandate and to report the results thereof to the undersigned, whereupon the plaintiffs and the intervenor-defendants may serve and file written comments thereon on or before September 26, 2005.

So ordered.

Decided: New York, New York
          June 7, 2005

                              Thomas  J.  Aquilino,  Jr.
                                   Senior Judge