**Slip Op. 12-63**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**Before: Nicholas Tsoucalas, Senior Judge**

| | |
|---|---|
| TIANJIN MAGNESIUM INTERNATIONAL CO., LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Consol. Court No.: 11-00006 |
| | : |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| and | : |
| | : |
| US MAGNESIUM, LLC, | : |
| | : |
| Defendant-Intervenors. | : |
| | : |

**MEMORANDUM ORDER**

**Held:** Plaintiff's Motion for Judgment on the Agency Record is denied. Defendant-Intervenor's Motion for Judgment on the Agency Record is granted in part and denied in part. This matter is remanded for proceedings consistent with this opinion.

Dated: May 16, 2012

Riggle & Craven, (David A. Riggle) for Tianjin Magnesium International Co., Ltd., Plaintiff.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Claudia Burke, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, (Renee Gerber); Thomas M. Beline, Office of Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for the United States, Defendant.

King & Spalding, LLP, (Stephen A. Jones and Jeffrey B. Denning) for US Magnesium, LLC, Defendant-Intervenor.

**TSOUCALAS, Senior Judge**:  This matter comes before the Court upon cross Motions for Judgment on the Agency Record filed by Plaintiff, Tianjin Magnesium International Co., Ltd. ("Tianjin") and Defendant-Intervenor US Magnesium, LLC ("US Magnesium").  Both parties challenge aspects of the final results of an administrative review of an antidumping order on pure magnesium from the People's Republic of China ("PRC") undertaken by the United States Department of Commerce ("Commerce").  For the reasons set forth below, the Court concludes that Commerce's decision not to apply total adverse facts available to Tianjin was not supported by substantial evidence in the record and was not in accord with the law.  The Court remands this matter for further proceedings consistent with this opinion.

## BACKGROUND

Under review in this case is the final determination from Commerce's administrative review for the period of May 1, 2008 through April 30, 2009.  See Pure Magnesium from the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Administrative Review of the Antidumping Order, 75 Fed. Reg. 80,791 (Dec. 23, 2010) ("2008-2009 Final Results").[1]  In the 2008-2009

---

[1] An amended final order was issued by Commerce on February 11, 2011 to correct certain ministerial errors immaterial to the issues considered herein.  See Amended Final Results of the 2008-2009 Antidumping Duty Administrative Review: Pure Magnesium from the People's Republic of China, 76 Fed. Reg. 7813 (Feb. 11, 2011).

<u>Final Results</u>, Commerce imposed on Tianjin a rate of 0.73%, and imposed a PRC-wide rate of 111.73%, which was also the adverse facts available rate imposed on two magnesium exporters that failed to respond to Commerce's questionnaire. <u>Id.</u> at 80,793-94.

Consistent with the arguments it makes now before this Court, US Magnesium argued during the administrative proceedings that total adverse facts available should have been applied to Tianjin. The Court notes at the outset that the material facts regarding Tianjin's conduct are not disputed by the parties. In September 2009, during the 2008-2009 administrative review, Tianjin submitted to Commerce voucher books and other accounting records evidencing sales of waste magnesium byproduct, which sales would have entitled Tianjin to an offset of its calculated normal value. However, the sales set forth in that documentation, some of which were purported to have taken place during the 2008-2009 period of review ("POR"), never occurred. <u>See</u> Issues and Decision Memorandum for the Final Results of the 2008-2009 Administrative Review at 4 (Dec. 15, 2010), Public Rec. 132 ("I&D Memorandum").[2]

The revelation that the sales evidenced in these voucher books never took place did not occur during verification in the 2008-2009 review currently before the Court. Rather, the fact that Tianjin

---

[2] Hereinafter all documents in the public record will be designated "PR" and all documents in the confidential record designated "CR."

had submitted fabricated voucher books came to light in July 2009

during verification in the 2007-2008 review.  Commerce described

this discovery as follows:

> [W]hile examining accounting documentation of this three-
> party scheme in one of Producers' voucher books,
> [Commerce] found that the relevant vouchers had been
> pasted into the books onto the stubs of vouchers that had
> been cut out.  Producers gave contradictory explanations
> of their accounting process in an attempt to explain why
> the vouchers had been pasted into the voucher books in
> this fashion.  When [Commerce] attempted to verify the
> authenticity of the receipts, Producers locked [Commerce]
> out of the accounting offices and threw requested voucher
> books out of the window of the accounting office in an
> attempt to keep them from [Commerce].  [Commerce]
> subsequently gained access to the accounting office and
> found evidence that Producers were creating documents
> while [Commerce was] locked outside.  Producers admitted
> that they were altering the voucher books by secretly
> pasting new vouchers in them with the receipts attached.

2007-2008 Final Results, Appendix, Comment 1 at 6-7.[3]  These

events, along with the fact that they occurred in the presence of

Tianjin's counsel, were further detailed in the verification report

in the administrative review for the 2007-2008 POR.  See

Verification of the Sales and Factors Responses of Tianjin

Magnesium International, Ltd. in the 2007-2008 Administrative

Review of the Antidumping Duty Order on Pure Magnesium from the

---

[3] In this quote, "Producers" refers to the producers of pure
magnesium who supplied Tianjin, and the "three party scheme"
refers to the purported waste magnesium sale arrangement between
Tianjin, these same suppliers, and certain creditors of the
suppliers.  See Pure Magnesium from the People's Republic of
China: Final Results of Antidumping Duty Administrative Review,
74 Fed. Reg. 66,089 (Dec. 14, 2009) ("2007-2008 Final Results"),
Appendix, Comment 1 at 1, 6.

People's Republic of China at 41 (Nov. 4, 2009), PR 40, CR 5, Ex. 1.

In the 2007-2008 Final Results, Commerce stated that "[g]iven the alteration of documents, the denial of access to source documentation, the misleading answers related to factory records, and the general obfuscation on the part of Producers, [Commerce cannot consider any of the production data verified in [the] review." 2007-2008 Final Results, Appendix, Comment 1 at 8. Commerce ultimately applied total adverse facts available to Tinajin, and that decision was upheld on appeal by this court. See Tianjin Magnesium Int'l Co. Ltd. v. United States, 35 CIT __, Slip Op. 11-100 (Aug. 10, 2011). In upholding Commerce's decision, the court determined that the record evidence as described above adequately supported Commerce's determination that Tianjin "failed to cooperate to the best of its ability because it continued to purport the accuracy of certain favorable valuations, despite the existence of discoverable falsifications in its producers' supporting documentation." Id., Slip Op. at 5.

The Court is presented herein with different circumstances than were presented in the 2007-2008 review. While the verifiers were not subjected to the same degree of obfuscation that occurred in the July 2009 verification, they did determine that, in support of its claim for a byproduct offset, Tianjin submitted some of the

same voucher books that had been discredited during the 2007-2008

review.

> We examined the . . . voucher book for May 2008 and saw
> that the receipts and invoices accompanying the voucher
> were pasted together, and a slip of some kind had been
> torn out. We asked why this was so, and the . . .
> accounting manager stated that there may have been some
> kind of error in the record keeping that had to be
> addressed by changing the source documents. We pointed
> out that this book, in fact, was one of the voucher books
> [Commerce] had previously determined to be unreliable
> because it was one of the books in which [Commerce] found
> [a Producer] cutting out vouchers and pasting in new ones
> with documentation for by-product transactions, during
> the previous POR's verification.

Verification of the Sales and Factors of Production ("FOP") of

Tianjin Magnesium Industries ("TMI") at 34-35 (June 7, 2010), PR

83, CR 24. Not only had Tianjin submitted the fabricated voucher

books in support of its claimed offset, but it submitted them two

months <u>after</u> the failed verification in the 2007-2008 review. <u>See</u>

I&D Memorandum at 4.

Commerce declined to apply adverse facts available in this

review despite the fact that Tianjin engaged in some of the same

conduct that led Commerce to apply adverse facts available in the

2007-2008 review, and despite the fact that it engaged in that

conduct two months after the failed July 2009 verification.

Commerce acknowledged that Tianjin submitted voucher books

previously determined to be "unreliable," <u>id.</u> at 5, but stated

that, with the exception of those materials, Tianjin "provided

complete answers to [Commerce's] questions . . . [giving it] the

necessary information on the record to construct an accurate and reliable margin for [Tianjin]." Id. Commerce continued that to calculate an accurate dumping margin for Tianjin, it considered Tianjin's factors of production, and concluded that Tianjin's factors of production "have not been compromised due to the presentation of the by-product voucher book in question." Id. at 6. Finally, Commerce disagreed with US Magnesium's position that denying application of adverse facts available would put Tianjin in no worse of a position than if it had cooperated to the best of its ability. Commerce again stated that, "with the exception of establishing its eligibility for a by-product offset, [Tianjin] answered [Commerce's] questionnaires and participated fully in verification." Id. at 7.

Following issuance of the 2008-2009 Final Results, review was timely sought in this court.

**JURISDICTION and STANDARD OF REVIEW**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006).[4] Additionally, the Court will uphold Commerce's determinations in administrative reviews unless they are "unsupported by substantial

---

[4] All further citations to the Tariff Act of 1930 are to the relevant provisions of Title 19 of the United States Code, 2006 edition.

evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).

## ANALYSIS

19 U.S.C. § 1677e, which provides for the application of
adverse facts available, states that

> [i]f the administering authority . . . finds that an
> interested party has failed to cooperate by not acting to
> the best of its ability to comply with a request for
> information from the administering authority . . . , the
> administering authority . . . , in reaching the
> applicable determination under this subtitle, may use an
> inference that is adverse to the interests of that party
> in selecting from among the facts otherwise available.

19 U.S.C. § 1677e(b). It is well-established that Commerce enjoys
broad discretion when considering whether to apply adverse facts
available in antidumping proceedings. See PAM, S.p.A v. United
States, 582 F.3d 1336, 1340 (Fed. Cir. 2009). This court has made
clear that this discretion does not saddle Commerce with the burden
of showing that an importer cooperated to the best of its ability
every time it determines that adverse facts available should not be
applied. AK Steel Corp. v. United States, 28 CIT 1408, 1417, 346
F. Supp. 2d 1348, 1355 (2004).

In exercising this discretion, however, Commerce is not
without guidance from the courts on what it means for a party to
"cooperate by . . . acting to the best of its ability."

> While the [best of its ability] standard does not require
> perfection and recognizes that mistakes sometimes occur,
> it does not condone inattentiveness, carelessness, or
> inadequate record keeping. It assumes that importers are

familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: (a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (emphasis added). In this case, Tianjin affirmatively sought the byproduct offset for waste magnesium, and when Commerce sought further information to substantiate the claimed offset, Tianjin submitted fabricated voucher books. I&D Memorandum at 4. Submitting voucher books that contained vouchers and receipts describing sales that never occurred could itself possibly have violated the standard set forth in Nippon Steel. However, submitting these voucher books two months after their falsity had been established in a failed verification seems well beyond the "inattentiveness, carelessness, or inadequate record keeping" that can render a party in breach of § 1677e(b). See id. at 1383 (noting that "intentional conduct . . . such as . . . inaccurate reporting . . . surely evinces a failure to cooperate . . . ."); see also Shanghai Taoen Int'l Trading Co., Ltd. v. United States, 29 CIT 189, 195, 360 F. Supp. 2d 1339, 1345 (2005) (concluding that

the adverse inferences standard is met "where a respondent purposefully withholds, and provides misleading, information.").

It is axiomatic that the Court may not substitute its judgment for that of Commerce. Texas Crushed Stone Co. v. United States, 35 F.3d 1535, 1540 (Fed. Cir. 1994). Additionally, as set forth above, the obfuscation in the 2008-2009 review did not, in certain respects, rise to the level of that which occurred in the 2007-2008 review. However, in the 2008-2009 Final Results and accompanying I&D Memorandum, Commerce never addresses the conduct by Tianjin that is squarely violative of the obligations outlined in the cases above. Commerce simply removed Tianjin's conduct from consideration by stating, no less than three times, that Tianjin cooperated fully and truthfully "with the exception" of the information submitted to support its byproduct offset claim. See I&D Memorandum at 5, 6, and 7.

Had the offset been applied to the normal value calculation, Tianjin could have benefitted from a lower margin. Especially in light of the materiality of this information to Tianjin's margin, Commerce was required to set forth its reasons for discounting out of hand conduct that went well beyond "inattentiveness, carelessness, or inadequate record keeping." If such reasons were provided, Commerce would also need to reconcile them with the cases set forth above affirming that where a party provides inaccurate or misleading information, it has not cooperated to the best of its

ability. Finally, Commerce never addressed why documents it described in the 2007-2008 Final Results as "altered" were downgraded to simply "unreliable" in this review. I&D Memorandum at 5. This change in language is consistent with the different outcomes of the two reviews, but the reason for the shift in language should have been explained by Commerce.

In addition to the infirmities already discussed, the Court is troubled by the possibility that the 2008-2009 Final Results would give Tianjin, and other respondents, an incentive to submit false information to Commerce in an attempt to lower their margins without the fear of negative consequences. Commerce dismisses this line of reasoning, stating that such arguments rely on a "[presumption] that [Tianjin] did not cooperate during this review." I&D Memorandum at 7. It continues by stating, in essence, that other than the established fabrications Tianjin submitted in an attempt to lower its margin, it fully cooperated in the review. Id. A conclusion like this leaves respondents without any downside to submitting false information in an attempt to lower their margins. If Commerce does not detect the false documents, a lower margin is obtained. If Commerce does detect the falsehood, such conduct is simply removed from consideration while Commerce focuses on all the ways in which the respondents did cooperate. Such an approach ignores that fact that a important "purpose of section 1677e(b) is to provide respondents with an incentive to

cooperate . . . ." <u>F.lli De Cecco Di Filippo Fara S. Martino S.p.A</u> <u>v. United States</u>, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

**CONCLUSION**

In light of the above, the Court concludes that the <u>2008-2009</u> <u>Final Results</u> were not supported by substantial evidence, and were not in accord with the law. Without a legitimate basis that can be discerned in the record, Commerce declined to consider the submission of misleading and inaccurate documentation by Tianjin two months after that documentation had been part of a failed verification. Commerce also did not address precedent that establishes the submission of such documentation as a failure to cooperate. The Court does not reach the other issues raised in the instant Motions at this time because they could become moot in light of subsequent proceedings in this case, and the Court remands this matter for proceedings consistent with this opinion.

      /S/ NICHOLAS TSOUCALAS
                    **Nicholas Tsoucalas**
                     **Senior Judge**

Dated: May 16, 2012
      New York, New York